**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| TOBY DIONNE PEGRAM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      1:18cv828 |
| | ) |
| C. WILLIAMSON, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the Court on "Defendants' Motion for Summary Judgment as to all Claims" (Docket Entry 55 (the "Summary Judgment Motion")) and "Defendants' Motion to Seal" (Docket Entry 64 (the "Sealing Motion")). For the reasons that follow, the Court should grant the Summary Judgment Motion and will grant in part and deny in part the Sealing Motion.

**BACKGROUND**

**I. Procedural History**

Alleging violations of his rights under the Fourteenth Amendment, Toby Dionne Pegram (the "Plaintiff") initiated this pro se action, pursuant to 42 U.S.C. § 1983 ("Section 1983"), against several current and/or former employees of the Guilford County Sheriff's Office:  C. Williamson ("Williamson"),[1] K.L. Watkins

---

[1]  For decades, Williamson worked "as a Detention Services Officer" (Docket Entry 59, ¶ 1) and, by the time relevant to this action, "ha[d] attained the rank of Major of the Court Services/Detention Bureau" (id.).

("Watkins"),[2] J.L. Rollins ("Rollins"),[3] M. Dodson ("Dodson"),[4] R. Stuart ("Stuart"),[5] Maynard,[6] and Boggs.[7]  (See Docket Entry 2 (the "Complaint"), at 3-5.)[8]  The Complaint alleges that each named employee should face individual- and official-capacity liability under Section 1983.  (See id.)

---

[2] Plaintiff identified Watkins as the former Division Commander of the Guilford County Detention Center in High Point. (See Docket Entry 2 at 3.)

[3] At the earliest time relevant to this action, "[Rollins] held the rank of Captain with the [Guilford County Sheriff's Office] and was the Division Commander of the Guilford County Detention Center in Greensboro" (Docket Entry 58, ¶ 2).  In May 2018, when Williamson retired (see Docket Entry 59, ¶ 1), Rollins attained "the rank of Major over the Court Services/Detention Bureau" (Docket Entry 58, ¶ 1).

[4] Dodson served as "the [First] Lieutenant and Assistant Division Commander" (Docket Entry 60, ¶ 1) before replacing Rollins, in May 2018, as "the Division Commander of the Guilford County Detention Center in Greensboro" (id.).

[5] Stuart worked "as a Detention Officer" (Docket Entry 56, ¶ 1) and, at the time relevant to this action, "held the rank of Master Corporal" (id., ¶ 2).

[6] As explained in more detail in the Procedural History that follows above, Plaintiff misnamed Officer S. Maynard as "Manor" in the Complaint.  (See, e.g., Docket Entry 2, ¶ 7.)  Because the materials accompanying the Summary Judgment Motion disclosed the proper spelling of Officer Maynard's name (see, e.g., Docket Entry 56, ¶ 3), this Memorandum Opinion uses the shorthand "Maynard" to refer to him.

[7] Plaintiff identified Boggs as a "F[ir]st Lieutenant" (Docket Entry 2 at 4) with the "Guilford County Sheriff Detention Bureau" (id.).

[8] Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.  For legibility reasons, this Memorandum Opinion uses standardized capitalization in all quotations from the parties' materials.

Boggs moved to dismiss (see Docket Entry 18 (the "First Dismissal Motion")) and, together with Stuart, answered the Complaint (see Docket Entry 22). Watkins and Williamson likewise moved to dismiss (see Docket Entry 44 (the "Second Dismissal Motion")) and, together with Dodson and Rollins, answered the Complaint (see Docket Entry 42). Maynard never answered as a result of service-related issues. (See Docket Entry 14 at 4 (process receipt and return indicating that no one with last name "Manor" worked at location of attempted service); see also Text Order dated Jan. 13, 2020 (alerting Plaintiff to that circumstance and ordering him to "show[] cause [on or before February 13, 2020] why the Court should not dismiss without prejudice any claim against [that defendant]").) Plaintiff did not respond to that order. (See Docket Entries dated Jan. 13, 2020, to Feb. 13, 2020.)

The undersigned United States Magistrate Judge recommended that the Court (i) grant the First Dismissal Motion, dismissing all claims against Boggs (see Docket Entry 24 at 17), (ii) grant the Second Dismissal Motion in part, dismissing "all claims against [] Watkins and the official-capacity claim against [] Williamson" (Docket Entry 47 at 18) but allowing the individual-capacity claim against Williamson to proceed (see id.), and (iii) dismiss without prejudice all claims against Maynard (see Docket Entry 29 at 6). The Court (per United States District Judge Catherine C. Eagles) adopted those recommendations (see Docket Entries 31, 37, 49), such

-3-

that only claims against Williamson, Rollins, Dodson, and Stuart (collectively, the "Defendants") survived dismissal.[9] Thereafter, the parties commenced discovery. (See Text Order dated Nov. 25, 2020 (adopting Scheduling Order).)

After discovery closed, Defendants filed the Summary Judgment Motion (Docket Entry 55), supporting brief (Docket Entry 67), and accompanying materials (Docket Entries 56, 57, 58, 59, 60, 61, 62, 63, 65, 66), seeking judgment in their favor on all claims. (See Docket Entry 55 at 1.) The following business day, the Clerk sent Plaintiff a letter advising him of his "right to file a 20-page response in opposition to the [Summary Judgment Motion] . . . within 30 days from the date of service upon [him]." (Docket Entry 68 at 1.)[10] The letter specifically cautioned Plaintiff that a "failure to respond or, if appropriate, to file affidavits or evidence in rebuttal within the allowed time may

---

[9] Although Williamson succeeded in challenging the official-capacity claims against him, such claims remain pending against Rollins, Dodson, and Stuart, who never moved to dismiss. (See Docket Entry 55 at 1 n.1 (acknowledging that Rollins, Dodson, and Stuart remain in this case in their individual and official capacities).)

[10] Defendants attempted to serve the Summary Judgment Motion (and related materials) on Plaintiff on September 17, 2021. (See Docket Entry 55 at 3 (certificate of service reflecting first-class mailing).) After learning that Plaintiff had not received all pertinent materials, Defendants sent additional copies and filed an amended certificate of service on October 5, 2021. (See Docket Entry 70.) In light of those circumstances, the Court (per the undersigned) extended Plaintiff's response deadline to November 8, 2021. (See Text Order dated Oct. 26, 2021.)

-4-

cause the [C]ourt to conclude that [Defendants'] contentions are undisputed and/or that [Plaintiff] no longer wish[es] to pursue the matter" (id.), as well as that, "unless [Plaintiff] file[s] a response in opposition to the [Summary Judgment Motion], it is likely . . . judgment [will be] granted in favor of [Defendants]" (id.). Despite those warnings, Plaintiff did not respond. (See Docket Entries dated Sept. 20, 2021, to present.)[11]

## II. Allegations

According to the verified[12] Complaint:

On August 28, 2017, Plaintiff, then a pretrial detainee at the Guilford County Detention Center in High Point ("High Point Detention Center") (see Docket Entry 2 at 6), "got into [a] verbal confrontation with Officer Harrison" (id., ¶ 1) regarding

---

[11] By local rule, "[i]f a respondent fails to file a response within the time required . . ., the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice." M.D.N.C. LR 7.3(k). In particular, a party's failure "to respond to a summary judgment motion may leave uncontroverted those facts established by the motion," Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993). However, the United States Court of Appeals for the Fourth Circuit requires substantive review of even unopposed motions for summary judgment. See id. ("[T]he court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.").

[12] The Complaint includes an undated verification, pursuant to which Plaintiff certified, under penalty of perjury, the accuracy of his allegations. (See Docket Entry 2 at 18.) Plaintiff's printed name (which appears twice on the verification (see id.)) appears to constitute his signature, as Plaintiff likewise printed his name on the signature line of his application for pauper status (see Docket Entry 1 at 4).

recreation hours (see id.).  After "Plaintiff requested to speak with a ranking officer" (id., ¶ 2), Officer Harrison denied that request (see id., ¶¶ 3-5) and ordered Plaintiff to return to his cell (see id., ¶ 5).  Plaintiff refused to comply with that order (see id., ¶ 6), prompting Officer Harrison to call for assistance (see id., ¶ 7).  "[M]oments later" (id.), Stuart and two other officers responded to Officer Harrison's call (see id. (alleging that Stuart arrived with since-dismissed Maynard and non-party Officer Moore)).

Officer Harrison indicated to Stuart that Plaintiff had refused to return to his cell.  (See id., ¶ 8.)  Stuart approached Plaintiff while the latter used the telephone in an attempt to contact his family members.  (See id., ¶ 9.)  Stuart spoke to Plaintiff and tried to take the telephone from his hand.  (See id., ¶ 10 (alleging that Stuart told Plaintiff, "[I]t['] s to[o] f[--]king late now").)  When Stuart stepped behind Plaintiff, the latter "reacted to stop any further assault" (id., ¶ 11), resulting in a "tussle to the floor" (id., ¶ 12).  While on the floor, Plaintiff verbalized his lack of resistance (see id.), and Maynard "punche[d ] Plaintiff in the head [three] to [four] times" (id.).  "Someone pull[ed] Plaintiff from behind by the collar" (id., ¶ 13), at which point Plaintiff "lay flat on his back [with his] arms down repeating [that] he [wa]s not resisting" (id.).

While Plaintiff remained supine, Stuart positioned himself across Plaintiff's abdomen (see id., ¶ 14) and Maynard began to "chok[e ] Plaintiff[,] using his body weight to press down and strangle [] Plaintiff" (id., ¶ 15). Plaintiff broke Maynard's grip, rolled over, and put his hands behind his back (see id., ¶ 16), allowing Stuart to handcuff him (see id., ¶ 17). Stuart then attempted to drag Plaintiff but, after other inmates protested (see id.), ultimately allowed him to regain his feet (see id., ¶ 18). Defendants then brought Plaintiff before a magistrate to face an assault charge and subsequently transferred him to the Guilford County Detention Center in Greensboro ("Greensboro Detention Center") (see id.), where Plaintiff received a housing assignment of "punitive isolation" (id., ¶ 19) without notice of "any disciplinary rights" (id.).

Fifteen days later, "Plaintiff received both [] notice of the [disciplinary] charges [against him] and a hearing" (id., ¶ 20). "[He] was cleared of assault[] and found guilty of interfering with staff duty and using lewd language." (Id., ¶ 21.) In response to an appeal by Plaintiff, Rollins dismissed the disciplinary case (see id., ¶ 22) but advised Plaintiff that he would "remain in punitive isolation, regardless of being cleared of the charges" (id., ¶ 23). In addition to receiving a permanent assignment of punitive isolation (see id., ¶ 24), Plaintiff could only leave his cell accompanied by two officers (see id.) and had "to wear leg

-7-

restraints, waist chain, and handcuff[s]" (id.). Rollins also reduced Plaintiff's recreation time from one hour per day to three hours per week. (See id., ¶ 25.) Plaintiff received neither an opportunity "to appeal his permanent punitive isolation" (id., ¶ 26) nor the right to present his views or offer "rebuttal evidence" (id.).[13]

Although Plaintiff requested "procedural due process" (id., ¶ 27), Rollins advised Plaintiff in writing that "no hearing or notice was needed and classification [wa]s not grievable" (id.). Plaintiff attempted to file a grievance three or four times before Rollins finally accepted one. (See id., ¶ 28.) That grievance (the "Grievance") challenged "the impl[e]mentation of a policy without due process" (id., ¶ 29; see also id. at 20 (characterizing Grievance as including claims of impermissible punishment, assault, and eighth- and fourteenth-amendment violations)). Rollins denied the Grievance, stating that "[Plaintiff] did assault [] Stuart and [that] no hearing or due process was required." (Id., ¶ 30; see also id. at 20 (alleging that denial by Rollins indicated "that [Plaintiff] would remain on permanent administrative segregation under the two[-]officer restriction").) Plaintiff appealed that denial, which Williamson upheld. (See id., ¶ 31; see also id. at 20 (alleging that Williamson concurred with decision by Rollins "to

_____

[13]  The Complaint alternately alleges that "[Plaintiff] was deprived of the right to call witness[es]" (id. at 16) and that "Plaintiff has no witness[es] to support his claim" (id., ¶ 44).

keep [Plaintiff] in permanent punitive isolation for [] infraction [he] was cleared of").)  When Plaintiff notified Dodson about his concerns, she advised that she would not change "established protocol . . . meaning [that Plaintiff] w[ould] remain in permanent punitive isolation" (id., ¶ 43).

While Plaintiff continued to demand "due process" (id., ¶ 32), his kosher meals (which he had requested in accordance with his religion) began arriving "cold or half cooked" (id.).  Unidentified staff would "handl[e ]Plaintiff's food with bare hands" (id., ¶ 33) and either force Plaintiff to accept cold or half-cooked food or heat it in a microwave in the staff breakroom (see id.).  "[Those practices] continued until [Plaintiff] stopped requesting [] due process."  (Id., ¶ 34; see also id., ¶ 35 (indicating that non-party official ordered correct handling of Plaintiff's food).)  Plaintiff feared retaliation if he complained (see id., ¶ 36) and later learned that his early recreation time resulted from a decision (by unidentified staff) to label Plaintiff as an escape risk (see id., ¶ 37; see also id., ¶ 38 (alleging that Rollins knew early recreation hours prevented Plaintiff from contacting his family)).  Plaintiff's assignment to punitive isolation caused him "heavy stress and depression" (id., ¶ 39), resulting in increases to and prescription of additional medication (see id.).

Based on the above events, the Complaint asserts that Defendants, in their individual and official capacities, violated

Plaintiff's fourteenth-amendment rights. (See id. at 3-5.) More specifically, the Complaint includes the following allegations (in a section entitled "basis for jurisdiction" (id. at 7)):

> [] Williamson . . . act[ed] under county regulation when he became personally involved in a constitutional deprivation when he failed to remedy the wrong and allowed the continuance of such a policy or custom which unconstitutional practices are enforced. This decision was based off of county regulations.
>
> *****
>
> [] Rollins . . . act[ed] under county regulation when he gave the administrative order to unconstitutionally keep [Plaintiff] in permanent punitive isolation for a[n] assault [he] was cleared of and disciplinary case [that] Rollins dismissed. This order was based off of county regulation.
>
> [] Dodson . . . act[ed] under county regulation when she became personally involved in [a] constitutional deprivation when she failed to remedy the wrong and allow the continuance of such a policy or custom which unconstitutional practices are enforce[d]. This decision was based off of county regulation.
>
> [] Stuart . . . act[ed] under county regulation when he [] commit[ted] a[n] assault and battery on [] Plaintiff. The force used was not necessary or part of jail policy and procedures, but it was viewed as necessary force by all levels of command. This action was based off of county policy, procedures, rules and regulations.
>
> *****

(Id. at 7-8.)

As relief, Plaintiff has sought (1) "a declaration that the [foregoing] acts and omissions . . . violate his rights under the Constitution and laws of the United States" (id. at 17), (2) "a preliminary and permanent injunction [effective immediately]

-10-

ordering [] Rollins and Dodson to cease their arbitrary governing, the enforcement of unwritten policies, and misuse of authority" (id.), (3) $20,000 in punitive damages, (4) "an[] additional [$]2,000 each from [] Williamson, . . . . Rollins, and Dodson for their roles as commanders and over the governing of the polices [sic] and procedure" (id.), (5) "a jury trial on all issues triable by jury" (id.), (6) recovery of costs (see id.), and (7) "any additional relief this Court deems just, proper, and equitable" (id.).

### III. The Record

Because Plaintiff verified the Complaint under penalty of perjury, the Court should treat "the [factual] allegations contained therein [that] are based on personal knowledge . . . [a]s the equivalent of an opposing affidavit for summary judgment purposes," Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).[14]

In support of the Summary Judgment Motion, Defendants submitted numerous exhibits including, inter alia, affidavits from Stuart (Docket Entry 56 (the "Stuart Affidavit")), C. Johnson ("Johnson") (Docket Entry 57 (the "Johnson Affidavit")), Rollins (Docket Entry 58 (the "Rollins Affidavit")), Williamson (Docket Entry 59), Dodson (Docket Entry 60), J. Southern ("Southern") (Docket Entry 61 (the "Southern Affidavit")), and M. Diehl (Docket

---

[14] For that reason, this Memorandum Opinion refers to such allegations as averments.

Entry 62 (the "Diehl Affidavit")); recordings from Stuart's body-worn camera (see Docket Entry 56-1 (slip sheet)) and from a surveillance camera at the High Point Detention Center (see Docket Entry 57-2 (slip sheet)); use of force reports (Docket Entry 57-4 (the "Use of Force Report"); see also Docket Entry 56-2 (partial duplicate)); incident reports (Docket Entry 57-1 (the "Incident Report"); see also Docket Entries 58-2, 61-3 (duplicates)), and disciplinary action reports (Docket Entry 58-3 (the "Disciplinary Action Report"); see also Docket Entry 57-3 (partial duplicate)) regarding the incident on August 28, 2017 (the "Incident"); incident reports and disciplinary action reports relating to other rule violations (Docket Entries 58-7, 58-8, 61-2; see also Docket Entries 61-4, 61-5 (duplicates)); Plaintiff's inmate request forms (Docket Entries 57-5, 58-4) and the Grievance (Docket Entry 58-5), including responses thereto; documentation of administration segregation recommendations and reassessments (Docket Entry 58-6; see also Docket Entry 61-1 (duplicate)); and the "Detention Bureau General Orders" (Docket Entry 58-1 at 1) applicable to the Guilford County Sheriff's Office (see id. at 1–27 (the "General Orders")). As relevant to the Summary Judgment Motion, the record reflects the following:

-12-

## A. Incident

The parties have offered somewhat consistent accounts of the Incident. According to the Stuart Affidavit and the Johnson Affidavit:

Around noon on August 28, 2017, while Stuart and Maynard "prepar[ed] to place restraints (i.e., handcuffs, waist chain, leg shackles) on an inmate located in a holding cell, [they] received a radio call from Officer Harrison in the Level 4 housing unit for male inmates." (Docket Entry 56, ¶ 3; accord Docket Entry 57, ¶ 3 (Johnson averring that, while assisting Stuart and Maynard, she heard Officer Harrison's calls).) In particular, Officer Harrison requested assistance with "Plaintiff[ ], who was using one of the inmate telephones in the housing unit and had refused Officer Harrison's instructions to end his phone call and return to his cell." (Docket Entry 56, ¶ 3; accord Docket Entry 57, ¶ 4.) After reporting an inability to place Plaintiff in the vestibule of the housing unit while awaiting assistance (see Docket Entry 57, ¶¶ 5-7 (explaining rationale for using vestibule for disruptive inmates)), Officer Harrison described Plaintiff's continued noncompliance as "loud" (id., ¶ 7) and "violent" (Docket Entry 56, ¶ 11); see also id., ¶ 3 ("[Plaintiff] was also creating a disturbance by yelling profanely at Officer Harrison in the presence of other inmates in the unit.")). Officer Harrison repeatedly called for Plaintiff's removal from the housing unit (see Docket Entry 57, ¶¶ 8-9), and

-13-

Stuart, Maynard, and Officer Moore arrived to assist (see Docket Entry 56, ¶¶ 11-12).

Stuart entered the housing unit ahead of Maynard and Officer Moore, walked past Officer Harrison, and advanced toward Plaintiff as he continued to use the telephone. (See id., ¶¶ 12-13.) At that time, Stuart instructed Plaintiff to hang up the telephone, but Plaintiff did not comply. (See id., ¶ 14.) Stuart attempted to hang up the telephone himself by "reach[ing] with [his] left hand to take control of the exposed upper portion of the handset" (id.) and by "plac[ing his] right hand on or near [Plaintiff's] left elbow" (id.). In response, Plaintiff pulled the handset out of Stuart's hand, turned his body, and "rais[ed] and jerk[ed] his left arm aggressively" (id., ¶ 15), all while screaming and ignoring Stuart's commands to hang up the telephone (see id.). Stuart then "placed [his] hands on [Plaintiff's] upper left arm" (id., ¶ 16) and, "[a]s [] Plaintiff attempt[ed] to turn to his right, . . . grip[ped] the back of his collar to maintain control of him" (id.). "As [Stuart] did so, [Plaintiff] swung back violently to his left and charged at [Stuart], catching [him] in [his] midsection and pushing [him] backward." (Id.) Stuart ended up on his back on the floor with Plaintiff on top of him. (See id., ¶¶ 17-18.)

Maynard and Officer Moore tried to remove Plaintiff from on top of Stuart (see id., ¶ 19) while Plaintiff "f[ou]ght and

-14-

physically resist[ed their] efforts to place him in handcuffs"
(id.). During the ensuing struggle on the floor, "[Stuart]
delivered two closed[-]fist strikes to [] Plaintiff's upper torso"
(id.). At some point during the altercation, Officer Moore drew
his Taser "and warned [] Plaintiff that he would deploy it if []
Plaintiff did not stop resisting" (id., ¶ 20), after which warning
"Plaintiff finally complied and lay on his stomach" (id.). Stuart
"kneel[ed] next to [] Plaintiff's right hip and appl[ied]
handcuffs" (id., ¶ 21), using "two sets of handcuffs, connected
together, to accomplish the handcuffing" (id., ¶ 22 (averring that
Plaintiff's size necessitated handcuffing in that manner)).
Stuart, Maynard, and Officer Moore then "assisted [] Plaintiff to
his feet so that [they] could escort him out of the housing unit
and down to the Main Booking Floor on Level 2." (Id.)

      1. Recordings[15]

Both Stuart's body-worn camera ("BWC") and a surveillance
camera at the High Point Detention Center captured parts of the
Incident. (See Docket Entries 56-1 (the "Bodycam Video"), 57-2
(the "Cellblock Video").)

---

[15] According to the Johnson Affidavit, "[t]he time clock on
the [surveillance] camera and on the Officers' body-worn cameras
operate off two different systems and are not synchronized."
(Docket Entry 57, ¶ 12.) That circumstance "accounts for any small
differences between the time stamps shown on the [recording from
Stuart's body-worn camera] and the time stamps reflected on the
[surveillance] video." (Id.) A discrepancy of approximately three
minutes and four seconds appears to exist between the two
recordings.

-15-

The Cellblock Video begins at 11:59:58 a.m. and ends at 12:08:59 p.m. (See Docket Entry 57-2.) The recording depicts a two-story section of the housing block that includes a common area with tables and telephones. (See id.) Plaintiff stands by the telephones, near the telephone closer to the camera, while another inmate uses the telephone next to Plaintiff and other inmates traverse the common area. (See id. at 11:59:58–12:04:53.) Officer Harrison stands near the telephones, at times partially beyond the camera's view. (See id.) Although the Cellblock Video includes no audio, Plaintiff and Officer Harrison appear engaged in conversation for several minutes (see id.), during which time Officer Harrison appears to show Plaintiff information on a clipboard (see id. at 12:00:43–12:00:50). At various times, Officer Harrison appears to speak into a radio on his shoulder. (See, e.g., id. at 12:01:39–12:01:58.) Plaintiff remains by the telephones, at times with a handset to his ear. (See, e.g., id. at 12:02:59.)

The Bodycam Video begins at 12:04:27 and ends at 12:12:22. (See Docket Entry 56-1.) For approximately the first three minutes, the Bodycam Video depicts Stuart and Maynard handcuffing another inmate. (See id. at 12:04:27–12:07:09.) During that process, the recording captures three of Officer Harrison's radioed requests for assistance with Plaintiff and the responses to those requests. (See id. at 12:04:57–12:05:06 (Officer Harrison advising

-16-

that Plaintiff refused to "lock down"), 12:07:03–12:07:13 (Officer Harrison expressing inability to place Plaintiff in vestibule and relating Plaintiff's "violent" noncompliance), 12:07:16–12:07:31 (Officer Harrison calling for Plaintiff's removal from housing block).) Between the second and third requests, Stuart begins to jog toward an elevator, where he joins Maynard and Officer Moore. (See id. at 12:07:13–12:07:47.) Stuart, Maynard, and Officer Moore exit the elevator on the fourth floor and proceed through the vestibule leading to the housing block. (See id. at 12:07:48–12:07:55.)

After Stuart, Maynard, and Officer Moore enter the housing block, Stuart walks past Officer Harrison and rounds a railing that separates the doorway from the telephones where Plaintiff stands. (See id. at 12:07:56–12:08:02; see also Docket Entry 57-2 at 12:04:53–12:04:59.) Stuart approaches Plaintiff, who speaks into a handset clutched in his right hand (see Docket Entry 56-1 at 12:08:02–12:08:05), while Maynard and Officer Moore remain a short distance away, behind the railing (see Docket Entry 57-2 at 12:05:00). As Stuart reaches for the handset, places a hand on Plaintiff's left arm, and orders him to hang up the telephone, Plaintiff pulls away, fending Stuart off with his left arm, while yelling and gripping the handset in his right hand. (See Docket Entry 56-1 at 12:08:04–12:08:09; see also Docket Entry 57-2 at 12:05:01–12:04.)

-17-

Stuart then orders Plaintiff to give him the telephone while placing both hands on Plaintiff's upper body. (See Docket Entry 56-1 at 12:08:08–12:08:10; see also Docket Entry 57-2 at 12:05:05–12:05:06.) As Stuart grabs Plaintiff's collar (see Docket Entry 56-1 at 12:08:10), Plaintiff turns to face Stuart with his arms outstretched (see id. at 12:08:11), the last image captured on the Bodycam Video before the ensuing struggle between Plaintiff and Stuart knocks the BWC to the floor.[16] The Cellblock Video depicts Plaintiff turning around and charging at Stuart, forcing Stuart to stumble backward and fall on the floor near several doorways bordering the common area. (See Docket Entry 57-2 at 12:05:07–12:05:09.)

Maynard and Officer Moore run to assist Stuart and succeed in removing Plaintiff from on top of Stuart. (See id. at 12:05:08–12:05:15.) As Maynard and Officer Moore try to secure Plaintiff and Stuart tries to regain his feet, the group stumbles closer to the common area tables, one of which partially obscures the vantage point from the Cellblock Video. (See id. at 12:05:15–12:05:18.) Plaintiff appears to lose his footing around the same time Stuart begins to right himself, during which time Stuart appears to strike Plaintiff once. (See id. at 12:05:18.)

---

[16] The Bodycam Video continues while the BWC falls to the floor but captures mostly distorted audio and only fleeting images of Plaintiff or other individuals. (Id. at 12:08:12–12:08:48.) For a short time thereafter, the Bodycam Video depicts only darkness but continues to record audio.

-18-

For approximately the next 40 seconds, while Plaintiff lies on the ground, the Cellblock Video does not clearly depict what transpires. (See id. at 12:05:18–12:05:57.) During that time, a male voice yells "Stop" (Docket Entry 56-1 at 12:08:23), and Plaintiff repeatedly (i) tells someone to "get off [his] throat" (id. at 12:08:39–12:08:42) and (ii) denies resisting (see id. at 12:08:43–12:08:48).

The Bodycam Video then briefly comes back into focus and depicts Plaintiff lying on the floor. (See id. at 12:08:48.) After another short period of darkness (id. at 12:08:50–12:08:55), the Bodycam Video captures someone issuing a command to "lock down" (id. at 12:09:00). Around that time, Stuart appears to gain control of one of Plaintiff's arms, allowing him to handcuff Plaintiff. (See Docket Entry 57-2 at 12:05:57.) A few seconds later, Officer Moore appears on the Bodycam Video with his Taser drawn (and pointed at the floor) while Plaintiff lies on his stomach with his hands behind his back and one set of handcuffs on his left wrist. (See Docket Entry 56-1 at 12:09:05.) Stuart then uses another set of handcuffs to secure Plaintiff's right wrist and attaches the two sets together. (See id. at 12:09:05–12:09:18.)

While Stuart and Maynard get to their feet and collect equipment misplaced during the struggle (see id. at 12:09:24–12:09:40), a female officer orders other inmates to "lock down" over their protests or other vocalizations (see id. at

-19-

12:09:07–12:10:10; see also Docket Entry 57-2 at 12:05:40–12:07:18 (depicting officers' efforts to clear inmates from common area)). In response to a request by Maynard (see Docket Entry 56-1 at 12:09:32), a female voice conveys the need for additional assistance in the housing block (see id. at 12:09:49–12:09:53).

Plaintiff remains handcuffed on the floor during that time. (See Docket Entry 57-2 at 12:06:21–12:07:05.) After Maynard twice tells Plaintiff to roll to his side (see Docket Entry 56-1 at 12:09:57–12:09:59), Stuart partially lifts Plaintiff (in a somewhat prone position) off the floor by one of his (restrained) arms, during which time Stuart appears to pivot slightly without taking any steps (see Docket Entry 57-2 at 12:07:06–12:07:08). When Stuart sets Plaintiff back down on the floor (see id. at 12:07:09), Plaintiff demands that officers "let [him] turn over and get up" (Docket Entry 56-1 at 12:10:12–12:10:17), in response to which Stuart and Maynard help Plaintiff roll onto his back and stand (see id. at 12:10:18–12:10:22; see also Docket Entry 57-2 at 12:07:12–12:07:16). The officers then allow Plaintiff to collect his shoes and escort him from the housing block. (See Docket Entry 56-1 at 12:10:24–12:11:00; see also Docket Entry 57-2 at 12:07:20–12:08:00.)

While Plaintiff and the officers ride the elevator and walk toward the holding cell, Plaintiff insists that he did not know, prior to intervention by Stuart, that he needed to end his

-20-

telephone conversation. (See Docket Entry 56-1 at 12:11:17–12:11:48.) Stuart disputes that statement, asserting that Officer Harrison told Plaintiff multiple times to lock down, which Plaintiff denies. (See id. at 12:11:48–12:12:08.)

### 2. Nurse's Statement

A nurse assessed Plaintiff about an hour after the Incident. (See Docket Entry 56-3 at 1.) She checked his handcuffs, documented his complaint of neck pain, and observed no injuries on his neck or elsewhere. (See id.)

### 3. Incident Report

Shortly thereafter, the Guilford County Sheriff's Office generated the Incident Report, which Officer Harrison and two supervisors signed on the day of the Incident. According to the Incident Report:

The Incident arose when Plaintiff disagreed with Officer Harrison's management of "a new intake program" (Docket Entry 57-1 at 1), during which disagreement Plaintiff (i) resorted to using profanity (see id.), (ii) demanded to speak with a ranking officer (see id. at 1–2), and (iii) refused to return to his cell (see id. at 2). Stuart, Maynard, and Officer Moore responded to assist Officer Harrison. (See id. at 1–2.) When Stuart attempted to end Plaintiff's telephone conversation, "[Plaintiff] turned and grabbed [] Stuart" (id. at 2). "At that point they both went to the floor and a Use of Force ensued." (Id.) Stuart, Maynard, and Officer

-21-

Moore eventually "escorted [Plaintiff] to [the] main floor with no other incident" (id.), but "[the housing unit where the Incident occurred] remained locked down for the remainder of the [] recreation period due to inmates not locking down to their cells during [the Incident]" (id.).

As a result of the Incident, Plaintiff incurred disciplinary charges for "A3: Assault on a government official[,] B7: Interfere with officer in the performance of duties, and C2: Disrespectful and profane language" (id.), as well as a criminal charge for Assault on a Government Official (see id.). Plaintiff denied guilt of the disciplinary charges and received a $2,000 bond for the criminal charge. (See id.) The Incident also resulted in the adoption of the "[two-]officer" (id.) restriction as to Plaintiff. (See id. ("[Plaintiff] is now listed as a '2 Officer' inmate.").) One supervisor (unidentified in the Incident Report) requested that "[Plaintiff] rec[ei]ve[] 60 days for this irrate [sic] behavior[] and for assaulting an officer." (Id.)

### 4. Use of Force Report

The Guilford County Sheriff's Office also investigated the use of force during the Incident by obtaining narratives from the involved individuals and witnesses. (See Docket Entry 57-4.) The Use of Force Report relates the following additional information from Stuart, Maynard, Officer Moore, Officer Harrison, and another non-party officer:

-22-

After Stuart arrived to assist Officer Harrison, he twice ordered Plaintiff to hang up the telephone. (See id. at 3 (Stuart's report), 4 (Maynard's report), 6 (Officer Moore's report).) When Plaintiff tackled Stuart, Plaintiff "gain[ed] control of [] Stuart and attempt[ed] to hit him." (Id. at 4.) "[Maynard and Officer Moore] ran over to assist to control the situation while [Plaintiff] aggressively kicked and screamed[,] trying to fight the officers." (Id. at 8 (Officer Harrison's report).) While Plaintiff remained on top of Stuart on the floor, "[Maynard] delivered [four] closed[-]fist strikes . . . to the back of [Plaintiff]'s head" (id. at 4). "[D]uring the struggle, [Officer Moore] received a random strike to the face from another officer" (id. at 6), causing him to "release[ his] grip on [Plaintiff] to regroup" (id.), while Stuart "spun [Plaintiff] over with the help of [] Maynard" (id. at 3; see also id. at 4 (Maynard reporting use of hip-toss technique to take Plaintiff to floor)). Because "[Plaintiff] continued to resist and attempt to fight . . . [Maynard] applied pressure . . . to [Plaintiff]'s jugular notch" (id. at 5). Officer Moore drew his Taser as "[Plaintiff continued to resist officers]." (Id. at 6; see also id. at 9 (stating that Plaintiff failed to comply with commands to put his hands behind his back).) "Once [Plaintiff] stopped resisting[, Maynard] released pressure [on Plaintiff's jugular

notch,] which allowed [them] to roll him to his stomach and place him in handcuffs." (Id. at 5.)

The Use of Force Report also includes Plaintiff's account of the Incident, which deviates in some respects from the foregoing narratives. According to Plaintiff's account, "[Stuart] never order[ed him] to end the call or submit to the [hand]cuffs" (id. at 7) before "tr[ying] to take the phone [and] grab[b]ing [him]" (id.). Consistent with the Complaint's reference to a "tussle" (Docket Entry 2, ¶ 12), Plaintiff's account acknowledges that "[he] push[ed Stuart]" (Docket Entry 57-4 at 7), after which the two "end[ed] up on the ground" (id.). Echoing Maynard's reported use of force, Plaintiff's account refers to someone punching him three or four times. (See id.; accord Docket Entry 2, ¶ 12 (averment that Maynard delivered such strikes).) Plaintiff further reported that, while on his back with Stuart and Maynard on top of him, Maynard choked him. (See Docket Entry 57-4 at 7; accord Docket Entry 2, ¶ 15 (averment that Maynard choked Plaintiff while subdued).) Although Plaintiff's account suggests, consistent with the Complaint (see Docket Entry 2, ¶¶ 12-14), that Plaintiff repeatedly verbalized his lack of resistance during the Incident (see Docket Entry 57-4 at 7), his account also concedes some degree of resistance (see id. ("I feared [] Stuart putting me in a chokehold is the only reason I resisted him . . . .")).

-24-

The Use of Force Report reflects that two supervisors and two commanders deemed the use of force during the Incident justified. (See id. at 1.)

     5. Administrative Segregation and Disciplinary Isolation

The General Orders define administrative segregation as "[a] classification assignment of an inmate . . . used to identify inmates who pose a threat to the safety and security of the institution or who need additional protection if they are left in General Population or Maximum Custody." (Docket Entry 58-1 at 2.) The definitions provide that administrative segregation applies to inmates awaiting disciplinary hearings (see id.) and to "known rule violator[s]" (id.). Assignment to administrative segregation may occur on an emergency basis. (See id. at 26.) The General Orders further clarify that "[a]dministrative segregation is a status of confinement in which an inmate is removed from the general population of the jail and placed in a setting that offers a higher degree of control and supervision than otherwise available" (id. at 25), but "not a punitive status" (id. (emphasis omitted)). Accordingly, "[i]nmates in administrative segregation shall be offered comparable programs as those in general population when security allows." (Id. at 26.)

In contrast, disciplinary isolation constitutes "[c]onfinement to a cell where an individual's movements and privileges are restricted" (id. at 3). "Disciplinary detention is a status of

-25-

confinement that entails separation from the general population after the Hearing Officer finds the inmate guilty under the disciplinary procedures." (Id. at 27.) "Inmates [in disciplinary isolation] are only allowed out of their cell for one hour on their scheduled days. Security rounds shall be performed at least four times per hour and documented." (Id.) Division commanders must review and approve such confinement when it lasts longer than 30 days. (See id.) Additionally, a classification officer must "visit the segregation housing unit Monday - Friday . . . [to] observe the inmate's behavior" (id. at 23) and forward to medical staff "[a]ny behavior warranting medical or mental health review" (id.).

After the Incident, staff at the Greensboro Detention Center housed Plaintiff in administrative segregation pending "a hearing with the classification officers" (Docket Entry 57-4 at 2; see also Docket Entry 62, ¶ 5 (averring that internal records confirm Plaintiff's placement in administrative segregation following the Incident)).

### 6. Hearing and Disciplinary Action Report

The General Orders define four classes of disciplinary offenses (see Docket Entry 58-1 at 4-8) and provide presumptive sanctions for each class (see id. at 9-11 (listing confinement in disciplinary isolation, change in classification, suspension of privileges, and loss of good conduct time as authorized

-26-

sanctions)). Under the General Orders, investigating officers should begin investigating a "possible violation of inmate conduct rules" (id. at 12) within 24 hours of receiving notification of the same (see id.) and should complete a report within 72 hours (see id. (listing contents of report)). Moreover, if a situation warrants formal disciplinary action, a shift commander should complete a disciplinary action report and give a copy to the inmate. (See id.) Disciplinary hearings must occur within seven days of a disciplinary charge, excluding weekends and holidays (see id.), and inmates must receive written notice of the charge at least 24 hours before the hearing (see id. at 13).

On the day of the Incident, Plaintiff signed the Disciplinary Action Report, which advised him of his disciplinary charges and a hearing on September 7, 2017. (See Docket Entry 58-3 at 1.) After the hearing (which actually occurred on September 12, 2017 (see id. at 2)), the hearing officer "found [Plaintiff] guilty of interfer[ing] with staff and resisting officer attempt to use handcuffs" (id.), as well as "disrespectful language" (id.). As punishment, Plaintiff received 50 days of disciplinary segregation and a 50-day suspension of his canteen, visit, and telephone privileges. (See id.) Plaintiff appealed that decision. (See id.) On September 15, 2017, when Rollins reviewed the hearing officer's actions, he disapproved the decision and dismissed the disciplinary case, noting that the hearing had occurred after the

seven-day deadline for the same. (See id.) That dismissal
terminated Plaintiff's disciplinary segregation. (See Docket Entry
62, ¶ 5.)

> However, upon review of
>
> the Incident Report, Use of Force Report[], body-worn
> camera video, and [surveillance] video concerning
> th[e I]ncident . . . [Rollins] determined th[at]
> Plaintiff was a very real physical threat and danger to
> the safety of [the] Detention Officers. Accordingly,
> [Rollins] directed that [Plaintiff] remain in an
> administrative segregation status[,] which required that
> he be supervised by two Detention Officers and be
> restrained in handcuffs, a waist chain, and leg shackles
> whenever he was outside of his cell.

(Docket Entry 58, ¶ 16; see also id., ¶ 17 (clarifying Plaintiff's
"non-punitive-administrative segregation status" before his
disciplinary hearing and after his successful appeal).)

Although the Disciplinary Action Report itself does not
indicate why Plaintiff did not return to general population after
Rollins dismissed the disciplinary case (see Docket Entry 58-3 at
2 ("Dismissed due to failure to meet required deadline. Hearing
conducted beyond [seven-]day period.")), Rollins averred that, "in
[his] decision to dismiss [] Plaintiff's disciplinary charges on
September 15, 2017, [he] explained to [Plaintiff] why he would
remain in administrative segregation" (Docket Entry 58, ¶ 23).
That averment squares with Plaintiff's recollection of "a notice
from [Rollins]" (Docket Entry 2, ¶ 23) stating the reason for
Plaintiff's continued placement in administrative segregation (see
id.).

-28-

### 7. Inmate Request Form

The General Orders provide for an informal request procedure that inmates must use before filing a formal grievance. (See Docket Entry 58-1 at 21.) Pursuant to that procedure, inmates may "request[] information, answers to questions, and responses to their requests . . . [from] their Post Officer or other employee" (id.), who should issue a request form if they cannot assist the inmate (see id.). Inmates should receive responses to their request forms within five days, and both the requesting and responding parties should maintain copies of the forms. (See id. at 22.)

On September 18, 2017, Plaintiff filed an inmate request form invoking his right to due process pursuant to the Fifth and Fourteenth Amendments, as well as "state constitutional due process guarantees" (Docket Entry 58-4 at 1). Three days later, Rollins responded by letter, the substance of which stated:

> As stated in my response to your appeal dated 9/15/17, your disciplinary charges . . . were dismissed. You are not under any disciplinary sanctions. You are housed in your current location (5D) due to lack of space in the Administrative Segregation pod (5E). You are classified Administrate [sic] Segregation under the two[-]officer restriction due to your aggressive action towards [] Stuart during the [Incident]. Classification is not grievable. Request for grievance is denied.

(Id. at 2.)[17]

_____

[17] In other words, although the Diehl Affidavit states that Plaintiff "returned to administrative segregation . . . on September 15, 2017, when [] Rollins set aside the discipline" (Docket Entry 62, ¶ 5), the foregoing response from Rollins

-29-

8. Grievance

On October 9, 2017, Plaintiff submitted the Grievance, challenging "the implementation of th[e two-]officer sanction policy" (Docket Entry 58-5 at 2). According to the Grievance, Rollins ordered that restriction as a form of "impermissible punishment . . . without giving any due process" (id.) in response to the Incident, during which Plaintiff asserted that "jail officials" assaulted him (see id.). The Grievance characterizes Rollins as biased and suggests that he covered up that assault. (See id.) In describing the Incident, the Grievance relates that, (i) after "[Plaintiff] disobeyed a direct order[] and requested to be sent down[]stairs" (id.), Stuart responded with physical force instead of attempting to verbally redirect Plaintiff (see id. at 2-3; see also id. at 4 (explaining that Stuart attacked Plaintiff without warning in response to verbal dispute)), and (ii) Plaintiff experienced "strangulation" or "felon[y] assault" while subdued by two officers (id. at 3). As relief, the Grievance requests release from administrative segregation, noting the dismissal of his disciplinary charges and lack of subsequent rule violations. (See id. at 4.)

On October 27, 2017, Rollins responded to the Grievance in writing, explaining that he dismissed Plaintiff's disciplinary

---

indicates that Plaintiff's physical location may have remained the same (at least for some period) despite the change in his classification.

-30-

charges because the hearing occurred after the required deadline. (See id. at 5.)  According to Rollins, that dismissal "d[id] not negate the fact that, regardless of [Plaintiff's] opinion about whether or not [] staff members handled the situation properly, [Plaintiff] did commit an assault on [] Stuart" (id.).  Rollins noted that "all levels of command" (id.) had reviewed and approved as justified the documented use of force against Plaintiff (see id.).  Rollins further stated that Plaintiff's classification changed as a result of the Incident, which change required "no hearing or due process" (id.).  Finally, Rollins advised Plaintiff that "[he] w[ould] remain on Administrative Segregation under the two[-]officer restriction for [his] recreation time."  (Id.)

That same day, Plaintiff appealed on the grounds that the change in his classification entitled him to notice and a hearing. (See id. at 6.)  Via the appeal, Plaintiff reiterated his contention that both Stuart and Maynard had violated (unspecified) procedures and policies during the Incident.  (See id. (suggesting that such violations occurred when Stuart attempted to take the telephone from Plaintiff, when Stuart used physical force instead of verbal reprimands, and when Maynard "strang[led]" Plaintiff).)

On November 8, 2017, Williamson responded in writing, "concur[ring] with [] Rollins" (id. at 7), "find[ing] that [Rollins] ha[d] responded appropriately" (id.), and "den[ying] . . . [the] appeal" (id.).

-31-

### 9. Review of Administrative Segregation

Under the General Orders, an assigned classification officer must review, every 15 days, "inmates who are confined in Administrative Segregation . . . [and] arrange for [] new housing . . . [w]hen circumstances allow for the safe return of the inmate to General Population" (Docket Entry 58-1 at 23; see also id. at 26 ("Reviews shall be conducted every 15 days after the inmate is assigned to administrative segregation.")).

A form entitled "Guilford County Sheriff's Office Detention Bureau Administrative Segregation Reassessment" (Docket Entry 58-6 ("Reassessment Form") at 2) documents such review. (See Docket Entry 61, ¶ 6.) The Reassessment Form includes a space for a classification officer to recommend continued placement in or removal from administrative segregation, as well as the reason for that recommendation. (See, e.g., Docket Entry 58-6 at 2.) Via the Reassessment Form, a division commander may (i) uphold or disagree with the classification officer's decision, and (ii) provide a reason. (See, e.g., id.)

On November 14, 2017, non-party classification officers recommended Plaintiff's placement in administrative segregation based on his "complet[ion of a] discip[linary] sentence" (id. at 1), noting his "place[ment] on admin[istrative segregation] because

of [his] behavior and assault on [an] officer" (id.).[18]  The
following day, Rollins upheld that decision.  (See id.)

Between Plaintiff's assignment to administrative segregation
on September 15, 2017 (see Docket Entry 58, ¶ 16; Docket Entry 62,
¶ 5), and his transfer to prison on November 14, 2018 (see Docket
Entry 58, ¶ 2; Docket Entry 62, ¶ 2), review of his administrative
segregation occurred on at least 20 occasions.  (See Docket Entry
58-6 at 1 (recommendation dated Nov. 14, 2017), 2-8 (Reassessment
Forms dated Nov. 30, 2017, Dec. 20, 2017, Jan. 18, 2018, Jan. 31,
2018, Mar. 6, 2018, Apr. 4, 2018, Apr. 20, 2018, May 7, 2018, May
24, 2018, June 11, 2018, June 25, 2018, July 11, 2018, July 26,
2018, Aug. 13, 2018, Aug. 29, 2018, Sept. 12, 2018, Sept. 28, 2018,
Oct. 16, 2018, and Oct. 31, 2018).)

Each of the 11 Reassessment Forms dated between November 30,
2017, and June 25, 2018, conveys the same information.  (See id. at
2-5.)  On each occasion, the classification officer (initially
"Felder/England" but later Southern)[19] recommended that Plaintiff
remain in administrative segregation because of his assault on
Stuart during the Incident.  (See, e.g., id. at 2 ("Reason: "Admin
because of behavior; aslt on officer"), 3 ("Reason:  Behavior

_____

    [18]  The record does not reveal (i) what necessitated such
recommendation on November 14, 2017, given Plaintiff's placement on
administrative segregation on September 15, 2017, or (ii) what
disciplinary sentence Plaintiff had completed at that time.

    [19]  The Southern Affidavit states that Southern's predecessor
completed reassessments before March 2018, when she began
employment as a classification officer.  (Docket Entry 61, ¶ 7.)

-33-

Assault on Detention Officer (HP)"), 4 ("Reason:  Admin (Assault
Officer High Point)").)  Between July 11, 2018, and October 31,
2018, the Reassessment Forms further list "Admin 2ofc Policy" (id.
at 5) as the reason for Plaintiff's placement in administrative
segregation (see id. at 5–8), usually alongside a reference to
Plaintiff's assault on Stuart (see, e.g., id. at 6).  Division
commanders universally upheld those decisions without comment (see
id. at 2–8), except for one instance on March 6, 2018, when Rollins
wrote "Assault on Detention Officer (HP)" (id. at 3) as the reason
for upholding Southern's decision (see id.).

     As for the conduct of such reassessments, the Southern
Affidavit states that "[Southern] relied on a specific set of
criteria and information to ensure that [her] decision-making was
fair, objective, and consistent from one inmate to the next."
(Docket Entry 61, ¶ 4.)  Southern elaborated that,

> [i]n particular, for each inmate[, she] reviewed (a) the
> nature of the inmate's criminal charges; (b) the inmate's
> disciplinary record; (c) whether the inmate has known
> enemies in the Jail that could pose a threat to him/her;
> (d) whether the inmate is considered a threat to harm
> other inmates or [the] Detention Staff; (e) whether the
> inmate is at risk of harming himself or herself; and
> (f) the inmate's medical and mental health needs.

(Id.)  Consistent with the applicable policy, "[Southern] also met
face-to-face with each inmate on a regular basis so that [she]
could make a complete assessment and not just rely on paper
documents or electronic records."  (Id.)

-34-

Southern, accompanied by Rollins, conducted one such meeting with Plaintiff on March 6, 2018. (See id., ¶ 10.) "While [] Rollins and [Southern] were speaking with [] Plaintiff about his administrative status, he became angry and began to direct profanities and obscene gestures towards [] Rollins." (Id.) After "Plaintiff's behavior became so angry and belligerent that [] Rollins and [Southern] decided to leave the floor" (id.), "[Southern] advised [Plaintiff] that his classification status would remain the same for th[at] assessment period" (id.).

During March and April 2018, the foregoing outburst and the Incident, as well as another "incident[] of violence on June 27, 2017" (id., ¶ 11), supplied the basis for Plaintiff's administrative segregation (see id.). Regarding the June 2017 incident, an incident report states that Plaintiff attacked another inmate following a discussion about how that inmate "enjoy[ed] robbing people and breaking into their homes" (Docket Entry 61-2 at 1). As a result, Plaintiff incurred a charge for "(B6) - initiate or provoke an assault on another" (id. at 2), of which he admitted guilt (see id.). Following a hearing, Plaintiff received 15 days of disciplinary isolation and a 15-day suspension of "phones, visits, canteen, and email [privileges]." (Id.) Two employees subsequently upheld the hearing officer's decision, and Plaintiff served his punishment until July 13, 2017. (See id. at 4.)

-35-

Per the Southern Affidavit, two subsequent incidents influenced Southern's review of Plaintiff's administrative segregation between May 2018 and October 2018. (See Docket Entry 61, ¶¶ 12-14.) First, Southern considered an incident on May 18, 2018, during "which [Plaintiff] angrily kicked his cell door, was disrespectful, and used profanity with [unidentified] Officers." (Id., ¶ 12.) More specifically, an incident report dated May 18, 2018, reflects that, earlier that day, two non-party officers encountered Plaintiff "mule-kicking his cell door." (Docket Entry 61-4 at 1.) According to their narrative, Plaintiff profanely stated that he would continue to kick the door until he received his correct meal, and he responded negatively when one of the officers told him to calm down. (See id.)[20]

_____

[20] The record reflects that Plaintiff submitted numerous inmate request forms between May 2017 and May 2018 regarding his meals. In particular, on May 12, 2017, in response to a request by Plaintiff that does not appear in the record, a non-party employee provided him with the regulations governing food and nutrient requirements and modified diets. (See Docket Entry 57-5 at 1.) That response also notified Plaintiff that staff would "monitor the kitchen in the preparation of [Plaintiff's] kosher diet." (Id.)

Later that year, Plaintiff lodged four separate requests relating to the temperature of his food. (See id. at 3 (form dated Nov. 27, 2017), 4-5 (forms dated Dec. 1, 2017), 6 (form dated Dec. 7, 2017).) The responses indicated that (i) the kitchen staff cooked inmate meals until the internal temperature reached at least 165 degrees (see id. at 3, 4), (ii) kosher meals arrived pre-cooked, such that they required only heating (see id. at 4), (iii) "kosher meals are cooked in their own oven" (id. at 5), and (iv) kitchen staff did not open inmate meals prior to serving them (see id.).

A response from Dodson, dated December 8, 2017, stated that she had learned from the kitchen supervisor that the kitchen staff heats the pre-cooked kosher meals for "at least 40 minutes and [until] the actual food temperature is [at least] 165 degrees" (id.

-36-

A narrative from a non-party supervisor further explains that Plaintiff had refused the food tray personally delivered to him, complaining about the use of a microwave to heat the food. (See id. at 2.) Officers ultimately removed Plaintiff from the housing unit and confirmed that kitchen staff had prepared Plaintiff's meal correctly. (See id.) Although Plaintiff later apologized, he denied guilt of the two disciplinary charges he faced as a result of that incident, "B7: Interfere with Staff Duties" and "C3: Willfully disobey or fail to obey a direct order." (Id.; see also id. at 3 (disciplinary action report documenting charges and Plaintiff's denial of guilt).) A hearing on those charges occurred on May 29, 2018, at which proceeding the hearing officer found Plaintiff guilty. (See id. at 4.) As punishment, Plaintiff received 15 days of disciplinary segregation and a 15-day suspension of telephone, canteen, and visit privileges. (See id.) Two employees upheld those decisions, and Plaintiff served his punishment until June 13, 2018. (See id.) According to the

---

at 7). Dodson advised that the kitchen staff knew of Plaintiff's concerns and directed him to contact her about other "incidents or problems with the meals." (Id.)

Via subsequent request forms in January 2018 and May 2018, Plaintiff voiced other food-related complaints, including on the same day as the above-described incident during which Plaintiff kicked his cell door. (See id. at 8 (objecting to excessive salad dressing and diluted lemonade), 9 (describing "ongoing kitchen issue" and "forced [] accept[ance of] food heated by detention personnel in the staff breakroom"), 10 (mostly illegible form).) The respective responses thanked Plaintiff for his patience (see id. at 8), reiterated that the kitchen staff complied with heating instructions (see id. at 9), and promised continued monitoring of the preparation of Plaintiff's meals (see id. at 10).

-37-

Southern Affidavit, "[t]he [foregoing] incident, when coupled with [Plaintiff's] prior assaultive history[,] justified keeping him in administrative segregation when he finished his disciplinary punishment." (Docket Entry 61, ¶ 12.)

Second, Southern's review between May 2018 and October 2018 accounted for the fact that, beginning in June 2018, "Plaintiff began a hunger strike and continued to direct profanity toward [] Staff." (Id., ¶ 13.) "During [] Administrative Segregation Re-Assessment visits with [] Plaintiff" (id.), which occurred on unspecified dates (see id.), "[Southern] would speak to him in person and counsel him that[,] before he would be a suitable candidate for re-entry into general population, he needed to demonstrate a willingness [to] comply with facility rules and regulations" (id.). Southern further emphasized Plaintiff's "documented jail history of failing to comply with facility regulations" (id.) and advised Plaintiff "that he would need to complete a sufficient and consistent period of time without any disciplinary infractions or rules violations to justify lowering his classification status and consider him a candidate for general population" (id.). In Southern's view, although "[Plaintiff's] hunger strike was not a violent act, . . . it was the type of negative behavior that further justified keeping [him] in administrative segregation where he would be more closely monitored by Detention Staff than in general population." (Id., ¶ 14; see

-38-

<u>also</u> <u>id.</u> (explaining that staff observations occur twice per hour in general population but four times per hour in administrative segregation).) Plaintiff's refusal of meals continued "periodically" (<u>id.</u>, ¶ 15) through October 2018.

10. Subsequent Incident

The Southern Affidavit also references an incident on October 23, 2018, during which "[Plaintiff] intentionally damaged a sprinkler head and flooded his cell." (<u>Id.</u>) Earlier that month, Plaintiff had submitted three inmate request forms (i) grousing about the amount of salad dressing provided (<u>see</u> Docket Entry 57-4 at 12 (form dated Oct. 4, 2018)), (ii) requesting "dietary information on kosher diet" (<u>id.</u> at 13 (form dated Oct. 21, 2018)) as well as "guidelines on preparation and handling [of] kosher diet" (<u>id.</u>), and (iii) declaring an emergency based on his belief that a member of the kitchen staff harbored a grudge against him (<u>see</u> <u>id.</u> at 14 (form dated Oct. 22, 2018)).

In response, staff (i) "apologize[d] for any confusion with [Plaintiff's] diet" (<u>id.</u> at 12), (ii) promised to "do better by [him]" (<u>id.</u>), (iii) advised him that "religious diets should mimic the regular menu as closely as possible while remaining in accordance with religious dietary laws" (<u>id.</u> at 13) and that a registered dietician had approved the menu (<u>see</u> <u>id.</u>), and (iv) committed to continued monitoring of the preparation of his meal (<u>see</u> <u>id.</u>). As far as Plaintiff's declared emergency, the

-39-

response from Dodson stated: "Your food is being prepared correctly and [in] accordance [with] the food service guidelines. In regards to your classification, you will continue to be assessed every 15 days." (Id. at 14.)

An incident report dated October 23, 2018, indicates that, earlier that day, a non-party officer responded to a fire alarm and discovered a water leak caused by a broken sprinkler head in Plaintiff's cell. (See Docket Entry 61-5 at 1.) According to the narratives in the report, Plaintiff stated that "[he was] going to give [staff] a reason to beat [his] ass" (id.) and threatened "to break a f--king sprinkler head every time [staff] f--k[ed] with [his] tray" (id. at 2). Plaintiff faced four disciplinary charges as a result of that conduct: (1) "(B7) - Interfere with a Staff Member in the performance of his or her duties" (id.), (2) "(B12) - Willfully damage, destroy, alter, tamper with or lose County/State property or property belonging to another" (id.), (3) "(C2) - Direct toward or use in the presence of any government official, any member of the Detention Staff, any inmate, or any member of the general public, oral or written language or specific gestures or acts that are generally considered disrespectful, profane, lewd, or defamatory" (id.), and (4) "(D5) - Willfully create a hazardous or physically offensive condition or situation" (id.). Plaintiff denied guilt of those charges. (See id. at 3.)

-40-

After a hearing on the following day, a hearing officer found Plaintiff guilty on all charges. (See id. at 4.) The officer decided that Plaintiff should spend 60 days in disciplinary segregation and lose the privileges of visits, canteen, telephone, email, and tablet. (See id.) A week later, two employees (including Dodson) upheld those decisions (see id.), and Plaintiff remained in disciplinary segregation until November 14, 2018, when he "transferred to [] prison to begin serving his active sentence" (Docket Entry 61, ¶ 15).

## DISCUSSION

### I. Summary Judgment Motion

### A. Relevant Standards

1. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light

-41-

most favorable to the nonmoving party," <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" <u>Miller v. Leathers</u>, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979)).  If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996). Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248.

"However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." <u>Lewis v. Eagleton</u>, No. 4:08CV2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (unpublished) (citing <u>Barber v. Hospital Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992)), <u>aff'd</u>, 404 F. App'x 740 (4th Cir. 2010); <u>see also</u> <u>Pronin v. Johnson</u>, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating

evidence" cannot defeat summary judgment).  In response to a summary judgment motion, "the nonmoving party [must] go beyond the pleadings and[,] by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324 (internal quotation marks omitted). Factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury.  See Reeves v. Hubbard, No. 1:08CV721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011) (unpublished), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

Consistent with those principles, "where affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie." Raynor v. Pugh, 817 F.3d 123, 130 (4th Cir. 2016) (internal quotation marks omitted). A limited exception to that rule exists "when there is evidence . . . of undisputed authenticity that shows some material element of the plaintiff's account to be 'blatantly and demonstrably false.'" Harris v. Pittman, 927 F.3d 266, 276 (4th Cir. 2019) (quoting Blaylock v. City of Phila., 504 F.3d 405, 414 (3d Cir. 2007)), cert. denied, 140 S. Ct. 1550 (2020).  In other words, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

-43-

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); see also, e.g., Love v. Beasley, 788 F. App'x 935, 937 (4th Cir. 2020) (concluding, on review of summary judgment decision, "that the district court did not err in finding that [a defendant] did not punch [the plaintiff] as alleged, because video of the incident confirms [the defendant's] denial").

Notably, though, in Scott,

the [United States] Supreme Court was faced with a videotape of the incident in question that "utterly discredited" the plaintiff's account, rendering it a "visible fiction." 550 U.S. at 380-81. As between a videotape of undisputed authenticity, id. at 378, and the plaintiff's story, the Court held, the videotape should prevail. Where the nonmoving plaintiff's account is "blatantly contradicted by the record" so that "no reasonable jury could believe it," it should not be adopted by a court ruling on a motion for summary judgment. Id. at 380.

As [the United States Court of Appeals for the Fourth Circuit] ha[s] clarified, Scott is the exception, not the rule. It does not "abrogate the proper summary judgment analysis, which in qualified immunity cases 'usually means adopting . . . the plaintiff's version of the facts.'" Witt v. West Va. State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011) (quoting Scott, 550 U.S. at 378). That standard continues to apply in the face of "documentary evidence" that lends support to a government official's account of events, id., or even makes it "unlikely" that the plaintiff's account is true, United States v. Hughes, 606 F.3d 311, 319-20 (6th Cir. 2010) (holding that Scott does not apply to photographs rendering plaintiff's account "unlikely"). Summary judgment is proper under Scott only when there is evidence — like the videotape in Scott itself — of undisputed authenticity that shows some material element of the plaintiff's account to be "blatantly and

-44-

demonstrably false." *Blaylock*, 504 F.3d at 414
(refusing to extend *Scott* to evidence in form of police
photographs that fail to depict "all of the defendant's
conduct and all of the necessary context"); *see also
Witt*, 633 F.3d at 277 (holding *Scott* inapplicable to
soundless video that does not capture key disputed
facts).

Harris, 927 F.3d at 275–76 (parallel citations omitted).

### 2. Section 1983

A state actor may incur individual liability under Section
1983 if, through affirmative misconduct, "he 'subjects, or causes
to be subjected' an individual 'to the deprivation of any rights,
privileges, or immunities secured by the Constitution.'" Randall
v. Prince George's Cnty., 302 F.3d 188, 202 (4th Cir. 2002)
(quoting Parratt v. Taylor, 451 U.S. 527, 535–36 (1981)). In that
regard, "[Section] 1983 must be 'read against the background of
tort liability that makes a man responsible for the natural
consequences of his actions.'" Vinnedge v. Gibbs, 550 F.2d 926,
928 (4th Cir. 1977) (quoting Monroe v. Pape, 365 U.S. 167, 187
(1961)). Accordingly, "it must be 'affirmatively shown that the
official charged acted personally in the deprivation of the
plaintiff's rights.'" Wright v. Collins, 766 F.2d 841, 850 (4th
Cir. 1985) (quoting Vinnedge, 550 F.2d at 928).

In turn, government officials incur official-capacity
liability only "when execution of a government's policy or custom,
whether made by its lawmakers or by those whose edicts or acts may
fairly be said to represent official policy, inflicts the injury,"

Collins v. City of Harker Heights, 503 U.S. 115, 121 (1992)
(internal quotation marks omitted); see also Gordon v. Kidd, 971
F.2d 1087, 1097 (4th Cir. 1992) (explaining that Section 1983
official-capacity liability "arises only when city or county
officials themselves, through an act establishing a policy or
custom, cause the constitutional violation"). An official's
discretionary acts, exercised in performing official duties, do not
necessarily represent official policy. See Gantt v. Whitaker, 203
F. Supp. 2d 503, 509 (M.D.N.C. 2002). "Rather, the official must
have 'final authority' over government policy with respect to the
action in question" to trigger official liability. Id. (quoting
Pembaur v. Cincinnati, 475 U.S. 469, 481-82 (1986)). Importantly,
official liability cannot exist absent an underlying constitutional
violation. See Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999);
see also Waybright v. Frederick Cnty., 528 F.3d 199, 203 (4th Cir.
2008) ("[S]upervisors and municipalities cannot be liable under
[Section] 1983 without some predicate constitutional injury at the
hands of the individual [municipal] officer, at least in suits for
damages." (third set of brackets in original) (internal quotation
marks omitted)).

a. Excessive Force

The Due Process clause of the Fourteenth Amendment protects
pretrial detainees from an officer's use of excessive force. See
Kingsley v. Hendrickson, 576 U.S. 389, 400 (2015). In Kingsley,

-46-

the Supreme Court observed that "pretrial detainees (unlike convicted prisoners) cannot be punished at all," id.; see also Graham v. Connor, 490 U.S. 386, 395 n.10 (1989) ("It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." (citing Bell v. Wolfish, 441 U.S. 520, 535-39 (1979))). Accordingly, a pretrial detainee can "prevail [on an excessive-force claim] by showing that the [defendant's] actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" Kingsley, 576 U.S. at 398 (quoting Bell, 441 U.S. at 561). Ultimately, a standard of objective reasonableness applies to a pretrial detainee's excessive-force claim. Id. at 398–99.

The Supreme Court has identified certain considerations that "may bear on the reasonableness or unreasonableness of the force used," namely:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. at 397. Courts must assess objective reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. In addition, courts must account for the

-47-

government's legitimate interests in managing the facility, "appropriately deferring to policies and practices that[,] in the judgment of jail officials[,] are needed to preserve internal order and discipline and to maintain institutional security." Id. (internal quotation marks and brackets omitted).

Further, in assessing objective reasonableness, a court should view the use of force "in full context, with an eye toward the proportionality of the force in light of all the circumstances." Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015) (internal quotation marks omitted); see also id. (explaining that Fourth Circuit has rejected defense "argu[ment] that [it] should take a 'segmented view of the sequence of events' and hold that each step taken by the officer was reasonable based on [the plaintiff's] immediately preceding actions"). Nevertheless, "[i]n considering the reasonableness of an officer's actions, [the court] must consider the facts at the moment that the challenged force was employed." Id. Notably, "the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds." Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005). In that regard, the Fourth Circuit "ha[s] made clear that the justification for using protective force expires at the very moment a threat is neutralized." Dean v. Jones, 984 F.3d 295, 305 (4th Cir. 2021) (explaining that, "[o]nce [the plaintiff] was subdued and [the defendant officer] no longer had reason to fear for

officer or public safety, the use of force became unnecessary and unjustified — even if all of that transpired merely seconds after [the plaintiff] head-butted [the defendant officer]"); see also, e.g., Waterman, 393 F.3d at 481 ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.").

      b. Conditions of Confinement

Courts also evaluate pretrial detainees' conditions of confinement in state custody under the Due Process Clause of the Fourteenth Amendment. See Bell, 441 U.S. at 535. "While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment, a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description." Hill v. Nicodemus, 979 F.2d 987, 991 (4th Cir. 1992). However, "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense," Bell, 441 U.S. at 537 (noting that confinement in a detention facility inherently involves "[l]oss of freedom of choice and privacy"). Additionally, "[t]h[e Supreme] Court has recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." Id.; see also Williamson v. Stirling, 912 F.3d 154, 175 (4th Cir. 2018) ("[J]ail officials are entitled to discipline pretrial detainees for infractions committed in custody

-49-

and to impose restrictions for administrative purposes without running afoul of *Bell*.").

The Fourth Circuit has identified both substantive and procedural aspects of due process claims asserted by pretrial detainees. See Williamson, 912 F.3d at 174–75. "Typically, a substantive due process claim pursued by a pretrial detainee challenges the general conditions of confinement or the treatment of all detainees in a specific facility." Id. at 174. In contrast, a procedural due process claim generally challenges individually imposed restrictions. See id. "[H]owever, the treatment of a pretrial detainee can be so disproportionate, gratuitous, or arbitrary that it becomes a categorically prohibited punishment that will sustain a substantive due process claim." Id. at 175.

"The controlling inquiry for [] a [substantive due process] claim is whether the conditions imposed on the pretrial detainee constitute punishment." Id. at 174 (internal quotation marks omitted). To prevail on such a claim, "a pretrial detainee must show unconstitutional punishment by proving that the challenged conditions were either '(1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred.'" Id. at 178 (quoting Slade v. Hampton Rds. Reg'l Jail, 407 F.3d 243, 251 (4th Cir. 2005)). "[A]bsent an explicit

intention to punish a pretrial detainee, [courts] must evaluate the evidence and ascertain the relationship between the actions taken against the detainee and the custodian's supporting rationale." Id. "An action may be reasonably related to a legitimate governmental purpose if 'an alternative purpose to which [the act] may rationally be connected is assignable for it' and the action does not appear 'excessive in relation to the alternative purpose assigned.'" Robles v. Prince George's Cnty., 302 F.3d 262, 269 (4th Cir. 2002) (brackets in original) (quoting Bell, 441 U.S. at 538).

With respect to procedural due process claims by pretrial detainees, both disciplinary and administrative measures "implicate a pretrial detainee's liberty interest in remaining free from punishment." Williamson, 912 F.3d at 175. However, the level of procedural protections due "var[ies] according to whether a restriction was imposed for disciplinary or administrative purposes." Id. To determine whether a particular restriction qualifies as disciplinary or administrative, "courts again consult the framework of *Bell*, which guides that inquiry for procedural as well as substantive due process claims." Id. at 182. Consistent with that inquiry, "courts must ask whether the restriction is expressly punitive, or whether a punitive intent may be inferred because the restriction is not reasonably related to a legitimate, nonpunitive purpose." Id. In that regard:

-51-

> If the restriction imposed by jail officials is a
> disciplinary one — arising from a pretrial detainee's
> misconduct in custody — the detainee is entitled to
> notice of the alleged misconduct, a hearing, and a
> written explanation of the resulting decision. If,
> however, a restriction imposed by the jail officials is
> for administrative purposes — which include managerial
> and security needs — the level of process to which the
> pretrial detainee is entitled is diminished. In those
> situations, the courts of appeals have generally
> concluded that some level of process must be afforded to
> the pretrial detainee, even if the process is provided
> after the restriction has been imposed.

Id. at 175 (internal citations omitted). As to the timing of such

process, "jails may and routinely do place inmates charged with

disciplinary infractions in 'administrative segregation' pending

their disciplinary hearings, allowing both prison officials and

inmates time to investigate and prepare for those hearings."

Dilworth v. Adams, 841 F.3d 246, 255 (4th Cir. 2016).

Furthermore, pretrial detainees remain entitled to at least as

many procedural protections as convicted prisoners. See

Williamson, 912 F.3d at 176 ("[T]he rights accorded convicted

prisoners provide a floor for detainee rights."). For example, a

convicted prisoner subject to administrative segregation must

receive "'some notice of the charges against him and an opportunity

to present his views' regarding his administrative segregation,"

id. at 183 (quoting Hewitt v. Helms, 459 U.S. 460, 476 (1983)),

which opportunity can occur "after the detention begins, but must

take place 'within a reasonable time,'" id. (quoting Hewitt, 459

U.S. at 476 n.8). "Prisoners must also receive periodic reviews of

-52-

their detentions to ensure that administrative segregation is not 'used as a pretext for indefinite [solitary] confinement,'" id. (brackets in original) (quoting Hewitt, 459 U.S. at 477 n.9), and "[such] reviews must be meaningful enough to take into account the 'facts relating to a particular prisoner,'" id. (quoting Hewitt, 459 U.S. at 477 n.9).

c. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Plaintiffs bear the burden of proof to show that a constitutional violation occurred," Mays v. Sprinkle, 992 F.3d 295, 302 n.5 (4th Cir. 2021), whereas "defendants bear the burden of showing that the violation was not clearly established, and [that] they are therefore entitled to qualified immunity," id.

**B. Analysis**

1. Individual-Capacity Claims

a. Excessive Force

According to Defendants, the Court should enter judgment in their favor on the excessive-force claim because Stuart used only objectively reasonable force during the Incident. (See Docket

-53-

Entry 67 at 17–20.)[21]  Alternatively, even if Stuart used unreasonable force, Defendants have sought judgment as a matter of law based on qualified immunity.  (See id. at 20.)

The Complaint alleges use of force by Stuart at three times during the Incident: (1) when Stuart attempted to take the telephone from Plaintiff (the "Intervention") (see Docket Entry 2, ¶ 10), (2) when Stuart and Plaintiff "tussle[d] to the floor" (id., ¶ 12), after which Stuart "lay[] across [] Plaintiff's abdomen" (the "Struggle") (id., ¶ 14), and (3) when Stuart "attempted to drag [] Plaintiff" (the "Escort") (id., ¶ 17).  As described in more detail above, the parties' competing accounts diverge as to whether (i) Stuart ordered Plaintiff, before the Intervention, to hang up the telephone (compare Docket Entry 2, ¶ 10 (averment that Stuart, without "inquir[ing any[ ]more information on the situation[, ]rushed over to [] Plaintiff[,] repeating, 'It[']s to[o] f--cking late now'"), with Docket Entry 56, ¶ 14 (averment that Stuart, while approaching Plaintiff, instructed him to hang up

_____

[21]  Defendants do not discuss the use of force by Maynard during the Incident (see id. at 17–20), perhaps in light of his dismissal (without prejudice) from this action (see Docket Entry 37).  Although Maynard's actions could inculpate Stuart as a bystander, that theory only applies "if [the bystander]: (1) knows that a fellow officer is violating an individual's constitutional rights, (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act," Randall, 302 F.3d at 204 (footnote omitted).  This Memorandum Opinion does not address that theory because the Complaint does not allege that Stuart bears bystander liability for Maynard's conduct (see Docket Entry 2) and because Plaintiff, by failing to respond to the Summary Judgment Motion, has not developed an argument in support of such theory.

-54-

telephone)), and (ii) the Escort involved an attempt to drag Plaintiff (compare Docket Entry 2, ¶ 17 (averment that Stuart attempted to drag Plaintiff while handcuffed), with Docket Entry 56, ¶ 22 (averment that "[officers] assisted [] Plaintiff to his feet" before removing him from housing unit)).

Beginning with the Intervention, although the (profane) statement that the Complaint attributes to Stuart could constitute the "instruction" that the Stuart Affidavit references, reasonable minds could differ about whether such statement qualifies as a directive. To the extent a dispute exists on that subject, the record does not warrant (under Scott) rejection of Plaintiff's account of the Intervention. In that regard, the Bodycam Video does not capture any discernible statement by Stuart as he approaches Plaintiff (see Docket Entry 56-1 at 12:08:02–12:08:05), such that it does not corroborate either party's version of the Intervention. See Witt, 633 F.3d at 277–78 (declining to apply Scott exception when documentary evidence left facts in dispute).)[22] Accordingly, the Court should credit, for purposes of the Summary Judgment Motion, Plaintiff's averment that the Incident occurred without a prior verbal order by Stuart.

_____

[22] The Bodycam Video does, however, capture Stuart ordering Plaintiff to relinquish the telephone after Stuart placed his hands on Plaintiff's upper body and tried to seize the handset. (See Docket Entry 56-1 at 12:08:08–12:08:10.) Even without considering that evidence, however, no dispute exists on that subject because Plaintiff has not (explicitly) averred that Stuart never ordered Plaintiff to end his conversation.

-55-

Turning to the manner of Plaintiff's departure from the housing block, the Stuart Affidavit does not explicitly contradict Plaintiff about what occurred during the Escort. In other words, the Stuart Affidavit does not deny an attempt to drag Plaintiff before "assist[ing ]Plaintiff to his feet" (Docket Entry 56, ¶ 22), which averment squares with Plaintiff's assertion that "Defendants let [him] stand up" (Docket Entry 2, ¶ 18). Even if the Court discerned a conflict between those statements, neither the Bodycam Video nor the Cellblock Video justifies rejection of Plaintiff's version because they do not "show[] some material element of [P]laintiff's account to be 'blatantly and demonstrably false.'" Harris, 927 F.3d at 276 (quoting Blaylock, 504 F.3d at 414). The Cellblock Video does depict a brief (albeit unsuccessful) attempt by Stuart to move a handcuffed (and prone) Plaintiff (see Docket Entry 57-2 at 12:07:06–12:07:08) before Stuart and Maynard allowed Plaintiff to roll over and "assisted [him] to his feet" (Docket Entry 56, ¶ 22). As a result, the Court should accept as true Plaintiff's averment that Stuart "attempted to drag [] Plaintiff [while handcuffed]" (Docket Entry 2, ¶ 17).

As relevant to Plaintiff's claims of excessive force by Stuart, the record, construed in the light most favorable to Plaintiff as the nonmoving party, reflects the following:

After a fellow officer requested assistance regarding Plaintiff's noncompliance with that officer's orders (see Docket

-56-

Entry 2, ¶¶ 5-6; Docket Entry 56, ¶ 3), Stuart approached Plaintiff while he continued to use the telephone, advising him, "'It[']s to[o] f--cking late now'" (Docket Entry 2, ¶ 10).[23]  Stuart placed one hand (and later, both hands) on Plaintiff's upper body during his (unsuccessful) attempt to seize the telephone, in response to which Plaintiff jerked away from Stuart, raised his left arm, and yelled at Stuart, still gripping the handset.  (See Docket Entry 56-1 at 12:08:04–12:08:10.)   When Stuart grabbed Plaintiff's collar, Plaintiff turned and charged at him, knocking him to the ground and landing on top of him.  (See Docket Entry 57-2 at 12:05:07–12:05:09.)

Once other officers pulled Plaintiff from on top of Stuart, but during the ensuing "tussle" (Docket Entry 2, ¶ 12) on the floor, Stuart delivered two closed-fist strikes to Plaintiff's torso (see Docket Entry 56, ¶ 19; Docket Entry 57-2 at 12:05:18), all while Plaintiff verbalized a lack of resistance (see Docket Entry 2, ¶¶ 12–14).[24]  Plaintiff remained noncompliant at the time Stuart struck him.  (See id. (lacking allegations of any strikes by

---

[23]  Although Plaintiff at one point denied such defiance (see Docket Entry 56-1 at 12:11:48–12:12:08 (Plaintiff insisting, to Stuart, that Officer Harrison never ordered Plaintiff to end his telephone conversation)), Plaintiff's subsequent averments establish his noncompliance with Officer Harrison's orders at the outset of the Intervention (see Docket Entry 2, ¶¶ 5–6).

[24]  The Court should credit Plaintiff's assertion that he verbalized his lack of resistance without assuming the truth of that verbalization.  Plaintiff elsewhere acknowledged that he resisted, at least to some degree, based on his fear that "Stuart [would] put[ him] in a choke[]hold" (Docket Entry 57-4 at 7).

-57-

Stuart, while subdued or otherwise); Docket Entry 56, ¶ 19 (Stuart's effectively uncontested averment that Plaintiff continued to resist at time of strikes).) While Plaintiff lay on his back with his arms down, Stuart lay across his abdomen. (See Docket Entry 2, ¶ 14.) After a use of force by Maynard (see id., ¶ 15) and a show of force by Officer Moore (see Docket Entry 56, ¶ 20), Plaintiff rolled onto his stomach, allowing Stuart to handcuff him (see id., ¶ 21).

Shortly thereafter, Maynard directed Plaintiff to roll to his side (see Docket Entry 56-1 at 12:09:57–12:09:59), after which order Stuart briefly "attempted to drag [] Plaintiff" (Docket Entry 2, ¶ 17) from his prone position on the floor (see Docket Entry 57-2 at 12:07:06–12:07:08 (depicting Stuart's two-second attempt to move Plaintiff)). Plaintiff then sought permission to roll over and stand up (see Docket Entry 56-1 at 12:10:12–12:10:17), which Stuart and Maynard helped him do (see Docket Entry 57-2 at 12:07:12–12:07:16).

For the following reasons, based on application of the Kingsley factors to the Intervention, Struggle, and Escort, the Court should hold that any reasonable fact-finder would view Stuart's use of force as objectively reasonable.

### i. Intervention

The first Kingsley factor (the relationship between the need for the use of force and the amount of force used) weighs in favor

Case 1:18-cv-00828-CCE-LPA   Document 71   Filed 02/23/22   Page 58 of 81

of Defendants. Plaintiff's refusal to comply with Officer Harrison's orders necessitated the first use of force by Stuart, and Stuart opted for relatively minimal force (i.e., "soft hands" (Docket Entry 56, ¶ 14)) at that time. See Neal v. Williams, No. 1:15CV126, 2017 WL 1745519, at *3 (M.D.N.C. May 3, 2017) (unpublished) (noting that detainee's noncompliant behavior triggered need for use of force), recommendation adopted, slip op. (M.D.N.C. June 23, 2017); Nazerzadeh v. Harris Cnty., No. 08-499, 2010 WL 3817149, at *30 (S.D. Tex. Sept. 27, 2010) (unpublished) (describing "soft or open-hand control . . . [a]s a low degree of force, designed to respond to low levels of resistance"). The Bodycam Video shows that Stuart applied only slightly more force (by grabbing Plaintiff's collar) in response to Plaintiff yelling and gesturing angrily at Stuart, while in possession of an object susceptible to use as a weapon (see Docket Entry 56-1 at 12:08:04-12:08:10). Under those circumstances, "the relationship between the need for force and the amount of force used to restore discipline was closely matched," Ellenburg v. Henderson Cnty. Jail, 1:14CV290, 2016 WL 1354980, at *4 (W.D.N.C. Apr. 5, 2016) (unpublished).

The second Kingsley factor (the extent of Plaintiff's injury) also favors Defendants. Plaintiff has not alleged any injury resulting from Stuart's use of force during the Intervention. (See Docket Entry 2, ¶¶ 10-11 (alleging only "shock[]" and "fear" as a

-59-

result of Stuart's "statement and action").)  The absence of any injury provides "strong evidence that the force used did not exceed that which was necessary to satisfy th[e security] concern." Berry v. Hershberger, Civ. Action No. 14-3145, 2015 WL 4615949, at *7 (D. Md. Jul. 30, 2015) (unpublished) (noting that the plaintiff only suffered "scratch to his back" from alleged use of excessive force); see also Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (discussing excessive-force analysis under Eighth Amendment and explaining that "the extent of injury suffered . . . may suggest whether the use of force could plausibly have been thought necessary in a particular situation" and "may also provide some indication of the amount of force applied" (internal brackets and quotation marks omitted)).

The third Kingsley factor (effort by the officer to temper or limit the amount of force) does not strongly weigh in favor of either party.  In that regard, under Plaintiff's version of the facts, Stuart did not issue a direct order to Plaintiff before placing a hand on his arm and attempting to seize the telephone (see Docket Entry 2, ¶ 10). See Lambert v. Thomas, No. 7:20CV2, 2021 WL 1156857, at *6 (W.D. Va. Mar. 26, 2021) (unpublished) ("[T]he prior use of verbal orders indicates [the officer]'s efforts to temper his use of force throughout the incident."). However, Plaintiff has conceded that Stuart, before any use of force, learned about Plaintiff's (evidently continued)

-60-

noncompliance with Officer Harrison's orders.  (See Docket Entry 2, ¶¶ 5–6, 8.)  Given that the Court assesses the use of force "from the perspective of a reasonable officer on the scene, including what the officer knew at the time," Kingsley, 576 U.S. at 397, Stuart's knowledge that Plaintiff had defied Officer Harrison's orders undercuts the extent to which this factor otherwise would favor Plaintiff.  Moreover, the short duration of the Intervention "demonstrates . . . that an effort was made to limit the amount of force applied," Mills v. Rich, No. 7:13CV138, 2015 WL 5139198, at *5 (E.D.N.C. Sept. 1, 2015) (unpublished).

The fourth and fifth Kingsley factors (the severity of the security problem at issue and the threat reasonably perceived by the officer, respectively) favor Defendants.  "Correctional officers do not have to be under physical attack to justify the use of force; they can also use appropriate force 'to preserve internal order by compelling compliance with prison rules and procedures.'" Shiheed v. Harding, 802 F. App'x 765, 767 (4th Cir. 2020) (quoting Brooks v. Johnson, 924 F.3d 104, 113 (4th Cir. 2019)).[25]  Notably, the entire Incident occurred in "the housing unit[,] where there is a significant danger of other inmates becoming involved in the encounter with officers," Griffin v. Okome, Civ. Action No.

_____

[25]  Although the cited cases involved application of eighth-amendment standards, courts have recognized that officers may use reasonable force to preserve order in facilities for pretrial detainees.  See, e.g., Sparks v. Henderson Cnty. Sheriffs Office, No. 1:16CV9, 2018 WL 1413186, at *6 (W.D.N.C. Mar. 21, 2018) (unpublished) (collecting cases).

19-2681, 2021 WL 119013, at *5 (D. Md. Jan. 13, 2021)
(unpublished); see also Whitley v. Albers, 475 U.S. 312, 321 (1986)
(applying eighth-amendment standards and recognizing that prison
administrators must account for "ever-present potential for violent
confrontation" (internal quotations marks omitted)). Furthermore,
Plaintiff's reaction during the Intervention would have caused an
objectively reasonable officer to anticipate potential violence.
(See Docket Entry 56-1 at 12:08:04–12:08:10.)

The sixth Kingsley factor (whether the plaintiff actively
resisted) favors Defendants. As already discussed, Stuart
approached Plaintiff with the understanding that he had refused to
comply with Officer Harrison's orders, and Plaintiff continued his
telephone conversation as Stuart drew closer. Although Plaintiff's
"initial resistance . . . was not aggressive, it was nonetheless
resistance that would reasonably cause [Stuart] to believe that the
use of force was necessary," Wilson v. Detweiler, Civil No. 20-869,
2021 WL 3188329, at *10 (D. Md. July 28, 2021) (unpublished),
appeal filed, No. 21-1923 (4th Cir. Aug. 23, 2021). Furthermore,
Plaintiff quickly engaged in more serious acts of resistance by
ignoring Stuart's directive to hang up the telephone while raising
his arm, screaming at Stuart, and wielding a potential weapon.
(See Docket Entry 56-1 at 12:08:04–12:08:10.)

In sum, the record evidence conclusively establishes that the amount of force Stuart applied during the Intervention does not qualify as objectively unreasonable under the circumstances.

ii. Struggle

Regarding Stuart's use of force during the Struggle, the Kingsley factors heavily favor Defendants. More specifically, as to the first and third Kingsley factors, "two closed[-]fist strikes to [] Plaintiff's upper torso" (Docket Entry 56, ¶ 19) and lying across Plaintiff's abdomen (see Docket Entry 2, ¶ 14) do not amount to a disproportionate or insufficiently limited use of force in response to Plaintiff charging at and tackling Stuart. See Edmonds v. Boswell, 3:14CV30, 2015 WL 6674188, at *4-5 (E.D. Va. Oct. 30, 2015) (unpublished) (concluding that officer's hand strike to push detainee away did not amount to excessive force where detainee "had been unruly and was . . . unrestrained," which presented "moderate security threat" to officer, and deeming use of Taser reasonable where detainee "actively resisted any effort by the officers to restrain him," and instead, "physically attacked" officer). As with the Intervention, the second Kingsley factor also cuts against Plaintiff, because he has identified no injury that Stuart caused during the Struggle (see Docket Entry 2; Docket Entry 56-3 at 1 (documenting only complaint of neck pain, which corresponds to actions of Maynard)). See Wilkins, 559 U.S. at 37.

-63-

With respect to the fourth and fifth <u>Kingsley</u> factors, an unruly, physically resistant detainee presents a "severe security problem and a threat to the safety of the . . . officers and others in the jail." <u>Edmonds</u>, 2015 WL 6674188, at *4; <u>see also</u> <u>Mills</u>, 2015 WL 5139198, at *4 ("[A] physical altercation between a police officer and detainee is indicative of a . . . security and safety issue . . . ."). As far as the sixth <u>Kingsley</u> factor, Plaintiff admitted some degree of resistance (<u>see</u> Docket Entry 57-4 at 7), and the Cellblock Video plainly shows Plaintiff attacking Stuart. (<u>See</u> Docket Entry 57-2 at 12:05:07–12:05:09.)

In all, application of the <u>Kingsley</u> factors leads to the conclusion that Stuart did not apply objectively unreasonable force during the Struggle.

### iii. Escort

The <u>Kingsley</u> factors apply somewhat differently to Stuart's "attempt[] to drag [] Plaintiff [while handcuffed]" (Docket Entry 2, ¶ 17). Under the first <u>Kingsley</u> factor, Plaintiff's handcuffed state during the Escort cuts against the need for force. <u>See,</u> <u>e.g.</u>, <u>Waterman</u>, 393 F.3d at 481. However, the Cellblock Video suggests that Stuart used relatively little force in (unsuccessfully) attempting to move Plaintiff. (<u>See</u> Docket Entry 57-2 at 12:07:06–12:07:08.) As concerns the second <u>Kingsley</u> factor, Plaintiff has not identified any injury resulting from the Escort. (<u>See</u> Docket Entry 2; Docket Entry 56-3 at 1.) Turning to

-64-

the third <u>Kingsley</u> factor, the extremely short duration of the Escort (i.e., two seconds) supports a finding of tempered or limited force, <u>see</u> <u>Mills</u>, 2015 WL 5139198, at *5, as do Maynard's repeated commands directing Plaintiff to "roll to [his] side" (Docket Entry 56-1 at 12:09:57–12:09:59) before Stuart tried to drag him, <u>see</u> <u>Lambert</u>, 2021 WL 1156857, at *6.

Regarding the fourth and fifth <u>Kingsley</u> factors, Plaintiff posed a lesser security problem once handcuffed, <u>see</u> <u>Greene v. Cnty. of Durham Office of the Sheriff Dep't</u>, No. 1:14CV153, 2016 WL 4507355, at *11 (M.D.N.C. Aug. 26, 2016) (unpublished), but numerous inmates around the common area remained unrestrained, noncompliant, and displeased with the Incident (<u>see</u> Docket Entry 56-1 at 12:09:07–12:10:10; Docket Entry 57-2 at 12:05:40–12:07:18), such that a reasonable officer under the circumstances could have perceived a need to remove Plaintiff from the housing block as quickly as possible. The sixth <u>Kingsley</u> factor could cut either way, insofar as the Escort may have resulted from Plaintiff's disregard of Maynard's orders to roll over or from Plaintiff's inability to roll over while handcuffed (absent the assistance that Stuart and Maynard later provided). Under either view of the sixth <u>Kingsley</u> factor, however, the Court should hold that no reasonable fact-finder would view Stuart's (minimal) use of force during the Escort as objectively unreasonable under the circumstances. <u>See</u> <u>Graham</u>, 490 U.S. at 396 (recognizing that "not every push or shove,

-65-

even if it may later seem unnecessary" amounts to constitutional violation (internal quotations marks omitted)).

In light of the foregoing analysis, the Court should determine that Plaintiff's excessive-force claim against Stuart cannot survive summary judgment.[26]

>    b. Conditions of Confinement

>        i. Administrative Segregation

Defendants have contended that the claim premised on Plaintiff's administrative segregation fails because (i) the restraints on Plaintiff evinced no intent to punish him (see Docket Entry 67 at 21-22) and (ii) he received regular review of "his administrative segregation status" (id. at 22; see id. at 22-23). To the extent the claim hinges on any delay in providing Plaintiff that review, Defendants have asserted that such deviations from policy do not qualify as constitutional violations. (See id. 23-24.) Finally, Defendants have invoked qualified immunity as alternative grounds for judgment in their favor. (See id. at 24.)

As far as whether his assignment to administrative segregation constituted punishment, Plaintiff has not identified any express punitive intent by Defendants. (See Docket Entry 2.) Moreover, Defendants' uncontested evidence establishes that "a legitimate nonpunitive governmental objective," Williamson, 912 F.3d at 178

---

[26] Given that resolution, the Court need not address the second prong of the qualified-immunity analysis, especially in light of Defendants' failure to develop an argument on that subject. (See Docket Entry 67 at 20.)

-66-

(internal quotation marks omitted), supported Plaintiff's assignment to administrative segregation, such that a reasonable fact-finder could infer no punitive intent. In that regard, Defendants have shown that, consistent with the General Orders (see Docket Entry 58-1 at 2) and routine practice, see Dilworth, 841 F.3d at 255, Plaintiff's initial removal from general population occurred while he awaited a disciplinary hearing for his conduct during the Incident (see Docket Entry 58, ¶ 11).[27]

Thereafter, Plaintiff's continued placement in administrative segregation rested on his assaultive behavior during the Incident (see id., ¶ 16) and during a previous incident (see Docket Entry 61, ¶ 11), as well as his conduct during a reassessment visit (see id., ¶ 10) and subsequent rule violations (see id., ¶¶ 12-14). In particular, Rollins averred that, following the Incident, he viewed Plaintiff as "a very real physical threat and danger to the safety of [the] Detention Officers" (Docket Entry 58, ¶ 16). By changing Plaintiff's classification and imposing restrictions on Plaintiff's movements outside his cell, Rollins aimed "to protect the Detention Staff from any further physical assaults or attacks" (id., ¶ 18). According to the Rollins Affidavit, those restrictions "were logically linked to the goal of protecting Officer

_____

[27] Although Plaintiff received an expressly punitive assignment to disciplinary segregation after that hearing, Rollins vacated that punishment after Plaintiff's appeal. (See Docket Entry 58, ¶ 15.) The record suggests that, before the dismissal by Rollins, Plaintiff spent three days in disciplinary segregation. (See Docket Entry 62, ¶ 5.)

-67-

safety . . . because . . . [they] made it much less likely that []
Plaintiff could attack an Officer or employee." (Id., ¶ 19; see
also id. (averring as to lack of "less restrictive measures that
could have accomplished the same safety goals").)

As far as post-Incident conduct, Southern averred that
Plaintiff (i) used profanity and obscene gestures during a
reassessment in March 2018 (see Docket Entry 61, ¶ 10),
(ii) incurred disciplinary charges for kicking his cell door and
using profanity in May 2018 (see id., ¶ 12), and (iii) began a
hunger strike in June 2018 (see id., ¶ 13). According to the
Southern Affidavit, Plaintiff's placement in administrative
segregation allowed staff to monitor him more closely. (See id.,
¶ 14.) However, despite repeated counseling by Southern, Plaintiff
failed "to make progress and correct his negative behavior" (id.,
¶ 16) before his November 2018 departure for prison (see id.,
¶ 15). In light of those proffered justifications, the Court
should conclude that no reasonable juror could view Plaintiff's
administrative segregation as "so disproportionate, gratuitous, or
arbitrary," Williamson, 912 F.3d at 175, that it violates
substantive due process guarantees.

Turning to the procedural aspects of Plaintiff's claim, the
undisputed record evidence establishes that, in connection with the
Incident, Plaintiff received "notice of the alleged misconduct, a
hearing, and a written explanation of the resulting decision,"

-68-

<u>Williamson</u>, 912 F.3d at 175.  Therefore, to the extent Plaintiff received punishment (including disciplinary isolation) as a result of the Incident, the Court should determine that he received adequate procedural protections.

With respect to his placement in administrative segregation and related restrictions, Plaintiff possessed entitlement to fewer procedural protections.  See <u>id.</u> at 182 (describing "diminished" level of process applicable to administrative restrictions), 183 (noting that detainees must receive, at minimum, (1) notice, (2) opportunity to present views, and (3) periodic, fact-specific review of administrative segregation).  Here, Defendants have shown that Plaintiff challenged the restrictions in September 2017 via an inmate request form (<u>see</u> Docket Entry 58-4 at 1) and in October 2017 via the Grievance (<u>see</u> Docket Entry 58-5 at 1–4), both of which garnered responses from Rollins (<u>see</u> Docket Entry 58-4 at 1–2; Docket Entry 58-5 at 5), and the latter of which received review by Williamson (<u>see</u> Docket Entry 58-5 at 6–7).  Thereafter, classification officers assessed the need for Plaintiff's continued placement in administrative segregation, which assessment included face-to-face visits with Plaintiff (<u>see</u> Docket Entry 61, ¶¶ 10, 13).  However, staff concluded that Plaintiff's behavior before, during, and after the Incident rendered him unsuitable for return to general population, documenting those decisions on Reassessment Forms (<u>see</u> Docket Entry 58-6 at 1–8).  Although the explanations on

the Reassessment Forms lacked detail (see id.), the Court should nonetheless hold that any reasonable fact-finder would deem the foregoing procedures compliant with the "diminished" due process protections available to Plaintiff in that context. See Williamson, 912 F.3d at 182–83.

Defendants' admitted failure (on certain occasions) to comply with internal procedures governing the review of Plaintiff's administrative segregation cannot sustain an independent due process claim. See Riccio v. County of Fairfax, 907 F.2d 1459, 1466 (4th Cir. 1990). In other words, "[t]he state is required to abide by minimum procedural due process requirements," Massey v. Singleton, No. 91-7297, 979 F.2d 848 (table), 1992 WL 336314, at *1 (4th Cir. Nov. 9, 1992) (unpublished), but not necessarily its own procedures, "when it places an inmate in administrative segregation," id. "Due process merely requires an informal, nonadversary review of the information supporting the confinement, including any response from the inmate, within a reasonable time after such confinement." Bryant v. Lanham, Nos. 93-6073, 93-6143, 30 F.3d 128 (table), 1994 WL 396345, at *2 (4th Cir. Aug. 1, 1994) (unpublished). For the reasons already discussed, the Court should conclude that Defendants satisfied those requirements here, notwithstanding any deviations from internal agency procedures.

ii. Recreation Time

Turning to the claim based on Plaintiff's recreation time, Defendants have contested the accuracy of the Complaint, stating that "Plaintiff received one hour of recreation per day whenever on administrative segregation" (Docket Entry 67 at 25), with reduced recreation restrictions (one hour per day three times per week) only while he "serv[ed] a disciplinary isolation sentence for his rule violations" (id.). In any event, even if reduced recreation occurred during administrative segregation, Defendants have characterized that practice as "entirely consistent with the State regulation on inmate exercise periods" (id. (citing 10A N.C. Admin. Code 14J.1004)), and have contended that "Plaintiff has not shown [that] his health suffered as the result of any restrictions on his out-of-cell recreation" (id.).

To the extent Plaintiff intended to assert a substantive due process claim based on the recreation policy during administrative segregation, the record (viewed in the light most favorable to Plaintiff) reflects that, (i) at Rollins's direction, Plaintiff remained subject to the two-officer restriction, as well as leg restraints, a waist chain, and handcuffs, during recreation time (see Docket Entry 2, ¶ 24), (ii) Rollins reduced Plaintiff's weekly recreation hours from seven to three (see id., ¶ 25), and (iii) Plaintiff's recreation time occurred "early" in the morning, at an unspecified time, as a result of his status as an "escape

-71-

risk" (id., ¶ 37; see id., ¶ 38). A neighboring court has dismissed a substantive due process claim based on allegations that, inter alia, "[an inmate] must be escorted everywhere in handcuffs and shackles[ and] stay[] in his cell 23 hours per day," Donohue v. Diggs, No. 7:11CV90, 2011 WL 795889, at *1 (W.D. Va. Mar. 1, 2011) (unpublished). See id. at *3. The Court similarly should conclude that the recreation policy here does not amount to "disproportionate, gratuitous, or arbitrary [punishment]," Williamson, 912 F.3d at 175, for purposes of a substantive due process claim.

Insofar as a reduction to Plaintiff's recreation time in disciplinary segregation occurred as a result of rule violations, such punishment resulted only after a notice, hearing, and written decision by a hearing officer. (See Docket Entry 58, ¶¶ 11, 15, 29, 30; see also Docket Entries 58-3, 58-7, 58-8.) By failing to respond to the Summary Judgment Motion, Plaintiff has not disputed those facts. Accordingly, the record establishes that Plaintiff received appropriate procedural protections in connection with any reduction to his recreation time, and the Court should rule that any reasonable fact-finder would so find.

Regarding Plaintiff's procedural challenge to the restrictions imposed during recreation, including the two-officer policy and physical restraints, Plaintiff has identified no express intent to punish. (See Docket Entry 2.) Nor would a reasonable fact-finder

-72-

infer a punitive intent because those restrictions "related to a legitimate, nonpunitive purpose," <u>Williamson</u>, 912 F.3d at 182. As discussed in the previous subsection, Rollins imposed restrictions on Plaintiff during recreation "to protect the Detention Staff from any further physical assaults or attacks." (Docket Entry 58, ¶ 18.) Plaintiff received multiple opportunities to voice his complaints about those restrictions, and staff at the Greensboro Detention Center repeatedly assessed the continued need for them. Therefore, the Court should order summary judgment for Defendants because they have demonstrated satisfaction of minimum due process guarantees.

### iii. Handling of Kosher Food

With respect to the claim based on the handling of Plaintiff's kosher food, Defendants have sought judgment in their favor on the grounds that (i) the Complaint does not inculpate Defendants in the allegedly improper handling of Plaintiff's food (<u>see</u> Docket Entry 67 at 25–26), (ii) Plaintiff failed to exhaust administrative remedies as to that claim (<u>see</u> <u>id.</u> at 26), and (iii) Plaintiff cannot demonstrate that staff acted with deliberate indifference toward his food-related complaints (<u>see</u> <u>id.</u> at 26–27).

The Court should conclude that the record lacks evidence from which a reasonable fact-finder could discern sufficient involvement by Defendants in the alleged mishandling of Plaintiff's food. In regard to such matters, the Complaint only alleges wrongdoing by

-73-

unspecified "detention personnel" (Docket Entry 2, ¶ 33) and unnamed "detention officers" (id.). (See id.; see also id., ¶ 34 ("It['] s to[o] many counts of it happening and officers to recall over the [nine-] month period. It was officers of all ranks[.] I pleaded with officer[s] but it continued until I stopped requesting for due process.").) The only more specific allegation on that subject states that "[Plaintiff] spoke with [] Dodson[,] who . . . [wa]s completely aware of the constitutional deprivation, and th[eir] wrong[-]doing" (id., ¶ 36). Because that evidence falls short of the personal involvement required for Section 1983 liability, see Wright, 766 F.2d at 850, the Court should grant the Summary Judgment Motion as to the food-handling claim.

## 2. Official-Capacity Claims

Insofar as Plaintiff has sought money damages from Defendants in their official capacities, Defendants have argued that such claims must fail because Section 1983 provides only injunctive relief against official-capacity defendants. (See Docket Entry 67 at 27 (citing Huang v. Board of Governors of Univ. of N.C., 902 F.2d 1134, 1138 (4th Cir. 1990).) Although "the Eleventh Amendment bars a suit by private parties to recover money damages from the state or its alter egos acting in their official capacities," Huang, 902 F.2d at 1138, "the Eleventh Amendment does not bar a suit against a North Carolina sheriff in his official capacity," Harter v. Vernon, 101 F.3d 334, 343 (4th Cir. 1996). In any event,

-74-

however, the Court should grant Defendants summary judgment on the remaining official-capacity claims.

First, as explained in connection with the Second Dismissal Motion, the Complaint "baldly asserts that [] Defendants [] operated under an unspecified 'county regulation' at the relevant times" (Docket Entry 47 at 15; see also Docket Entry 2 at 7–8 (lodging similarly deficient allegations against Rollins, Dodson, and Stuart)). Those bare contentions do not create a genuine dispute of material fact as to whether Rollins, Dodson, or Stuart qualify as policymakers or acted in a policymaking capacity at the relevant times. Alternatively, the Court should deem official liability for damages unavailable because the record reveals no underlying constitutional violation by Defendants. See Waybright, 528 F.3d at 203. Finally, any official-capacity claim for declaratory and/or injunctive relief should fail because, even if a constitutional violation had occurred, Plaintiff's "transfer . . . from a unit or location where he is subject to the challenged policy, practice, or condition, to a different unit or location where he is no longer subject to the challenged policy, practice, or condition moots his claims for injunctive and declaratory relief," Incumaa v. Ozmint, 507 F.3d 281, 286–87 (4th Cir. 2007). Accordingly, the Court should conclude that the official-capacity claims cannot survive summary judgment.

## II. Sealing Motion

Defendants have sought to seal the Bodycam Video and the Cellblock Video (collectively, the "Videos"), filed in connection with the Summary Judgment Motion. (See Docket Entry 64.) According to Defendants, the "[V]ideos constitute 'law enforcement agency recordings'" (id. at 2 (quoting N.C. Gen. Stat. § 132-1.4A)) and do not qualify as public records (see id. (citing N.C. Gen. Stat. § 132-1.4A(b)). Defendants have asserted that materials like the "[V]ideos are generally protected from public disclosure absent a Court Order." (Id. (citing N.C. Gen. Stat. § 132-1.4A(f) & (g).) Defendants have requested that the Videos remain part of the public record if the Court denies the Sealing Motion. (See id.)

## A. Relevant Standards

"[T]wo independent sources" provide the public with a right of access to judicial records: "the common law and the First Amendment." Virginia Dep't of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004). "[T]he common[-]law presumption in favor of access attaches to all 'judicial records and documents,'" Stone v. University of Md. Med. Sys. Corp., 855 F.2d 178, 180 (4th Cir. 1988) (quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978)), but "the First Amendment guarantee of access has been extended only to particular judicial records and documents," id. (citing Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253

-76-

(4th Cir. 1988) (documents filed in connection with summary judgment motion in civil case)).

When a party proposes to seal judicial records to which a public right of access applies, the Court begins by "determin[ing] the source of the right of access with respect to each document," as "only then can it accurately weigh the competing interests at stake." Virginia Dep't of State Police, 386 F.3d at 576 (internal quotation marks omitted). "Th[e common-law] presumption of access . . . can be rebutted if countervailing interests heavily outweigh the public interests in access." Rushford, 846 F.2d at 253. The relevant factors include "whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event; and whether the public has already had access to the information contained in the records." In re Knight Publ'g Co., 743 F.2d 231, 235 (4th Cir. 1984). Under the more stringent first-amendment standard, the Court may seal material "only on the basis of a compelling governmental interest, and only if the denial [of access] is narrowly tailored to serve that interest." Stone, 855 F.2d at 180.

Under either standard, the Court evaluates the competing interests according to the following procedure. First, "it must give the public notice of the request to seal and a reasonable

opportunity to challenge the request," <u>Virginia Dep't of State Police</u>, 386 F.3d at 576. Next, "it must consider less drastic alternatives to sealing," <u>id.</u> Finally, "if it decides to seal[,] it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing." <u>Id.</u> Those steps "ensure that the decision to seal materials will not be made lightly and that it will be subject to meaningful appellate review." <u>Id.</u>

### B. Analysis

As an initial matter, the Sealing Motion fails to comply with this Court's Local Rules, which obligate Defendants to explain the necessity for sealing "with citation to any supporting statutes, case law, or other authority." M.D.N.C. LR 5.4(c)(3). The Sealing Motion wholly relies on the North Carolina statute classifying the Videos, under North Carolina law, as non-public "law enforcement agency recordings" (Docket Entry 64 at 2 (citing N.C. Gen. Stat. § 132-1.4A)). (<u>See</u> <u>id.</u> at 1-2.) Regardless of that state-law definition, however, the proponent of a request to seal must identify the applicable public access right (i.e., common-law or first-amendment), if any, and justify the request under that standard. <u>See</u> <u>Robinson v. Bowser</u>, No. 1:12CV301, 2013 WL 3791770, at *7 (M.D.N.C. July 19, 2013) (unpublished) ("Plaintiff has not cited any authority [suggesting] that th[e] concerns [embodied in state law] inevitably outweigh the need for transparency in federal

-78-

judicial proceedings or that those statutes should play a role in this Court's assessment of the propriety of sealing judicial documents . . . ."); see also Sluder v. Bentancourt, No. 1:20CV135, 2020 U.S. Dist. LEXIS 151529, at *1-3 (W.D.N.C. Aug. 20, 2020) (unpublished) (denying blanket motion to seal documents purportedly "confidential pursuant to state and federal law").  Although noncompliance with this Court's Local Rules provides a sufficient basis to deny the Sealing Motion, see M.D.N.C. LR 5.4(c)(3), the Court nonetheless exercises its discretion to consider the request.

As discussed previously, that review first looks to certain procedural norms, consistent with which the record reflects that all parties and the public have possessed access to the Sealing Motion since September 17, 2021. (See Docket Entry 64.)  Moreover, no party or member of the public has filed anything in the intervening time period. (See Docket Entries dated Sept. 17, 2021, to present.)  Accordingly, the Court finds all procedural prerequisites satisfied, as any interested persons have received "notice of the request to seal and a reasonable opportunity to challenge [it]," Virginia Dep't of State Police, 386 F.3d at 576.

Turning to the substance of the Sealing Motion, the first-amendment standard applies because the Videos accompanied the Summary Judgment Motion.  See, e.g., Lord Corp. v. S&B Tech. Prods., Inc., No. 5:09CV205, 2012 WL 1015835, at *1 (E.D.N.C. Mar. 22, 2012) (unpublished) (applying first-amendment standard to

-79-

motion to seal response to objections to recommendation because "documents sought to be sealed have been filed in connection with or relate to a motion that seeks dispositive relief"). Although the Sealing Motion has not identified a compelling interest under the first-amendment standard, the Court notes that (i) the Cellblock Video could "show[] dead spots in the video surveillance [of the High Point Detention Center]," Chrisman v. Board of Cnty. Commissioners of Okla. Cnty., No. CIV-17-1309, 2020 WL 12948695, at *2 (W.D. Okla. Oct. 9, 2020) (unpublished), such that "a person could watch the [Cellblock V]ideo[] and determine where to stand to avoid coverage of the camera[]," id., and (ii) safety concerns may constitute "overriding interests that outweigh the presumption of public access to judicial records," Hembree v. Branch, No. 3:17CV485, 2019 U.S. Dist. LEXIS 121588, at *1–2 (W.D.N.C. July 22, 2019) (unpublished) (deeming such concerns sufficient under first-amendment standard to justify sealing of camera footage); see also Rogers v. Jackson, No. 5:15-CT-3092, 2017 WL 4246866, at *9 (E.D.N.C. Sept. 25, 2017) (unpublished) ("[T]he safety of inmates in a prison setting is a 'compelling governmental interest.'" (quoting McRae v. Johnson, 261 F. App'x 554, 558 (4th Cir. 2008))). Conversely, the Bodycam Video does not appear to reveal "the layout of the [High Point Detention Center], entry and exit points, [or] camera angles," Chrisman, 2020 WL 12948695, at *1, such that the compelling interest in safety cannot justify its non-disclosure.

Accordingly, the Court will grant in part and deny in part the Sealing Motion.

**<u>CONCLUSION</u>**

Defendants have established entitlement to judgment as a matter of law on all of Plaintiffs' claims. Additionally, the interest in jail security outweighs the first-amendment right of access to the Cellblock Video. However, public disclosure of the Bodycam Video does not implicate, to the same extent, such overriding safety concerns.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 55) be **GRANTED.**

**IT IS THEREFORE ORDERED** that the Sealing Motion (Docket Entry 64) is **GRANTED IN PART AND DENIED IN PART,** such that the Cellblock Video (Docket Entry 57-2) shall remain under seal but the Clerk shall unseal the Bodycam Video (Docket Entry 56-1).

/s/ L. Patrick Auld<br>**L. Patrick Auld**<br>**United States Magistrate Judge**

February 23, 2022

-81-